JOHN A. BLOOM & others *vs.* CITY OF WORCESTER
& another.

Worcester.   November 9, 1972. — February 22, 1973.

Present: TAURO, C.J., REARDON, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Constitutional Law*, Home Rule Amendment. *Municipal Corporations*, Human rights, By-laws and ordinances. *Human Rights. Witness*, Subpoena. *Words*, "Inconsistent," "Repugnant."

Discussion of the determination whether a municipal ordinance or by-law is "inconsistent" with statutes within § 6 of the Home Rule Amendment, art. 89 of the Amendments to the Massachusetts Constitution. [149–157]
A city ordinance, which in summary established a human rights commission and an advisory human rights committee, gave the commission the power and duty to receive and investigate complaints and to initiate its own investigation on various forms of discrimination, gave the commission the power to attempt by mediation

to resolve any complaint within its jurisdiction and to recommend appropriate action to governmental agencies, and authorized the commission, "in the case of any unresolved complaint or in the case of any investigation which would be aided thereby," to hold hearings and subpoena witnesses did not violate the provision of § 7 (5) of the Home Rule Amendment, art. 89 of the Amendments to the Massachusetts Constitution, respecting the enactment by municipalities of "private or civil law governing civil relationships" [146–147]; was not "inconsistent" with G. L. c. 151B, c. 151C, c. 233, § 8, or any other general law [158–160, 161–164]; and was validly enacted under § 6 of the Home Rule Amendment and G. L. c. 43B, § 13 [147–149, 158].

A power given to a human rights commission by a city ordinance to "subpoena witnesses . . . [and] compel their attendance" did not authorize the commission to compel attendance other than by application to a court under G. L. c. 233, § 10. [161 n. 17]

BILL IN EQUITY filed in the Superior Court on October 18, 1971.

The suit was reported by *Rutledge, J.*

*James A. Brett,* Assistant City Solicitor (*Henry P. Grady,* City Solicitor, with him) for the City of Worcester & another.

*William B. Field* (*Robert S. Bowditch* with him) for the plaintiffs.

*Robert H. Quinn,* Attorney General, as amicus curiae, & *Walter H. Mayo, III,* Assistant Attorney General, submitted a brief.

WILKINS, J. In this proceeding, which has been reported to us without decision on a case stated, the parties seek a determination as to the validity of an ordinance of the city of Worcester which established and granted certain powers to a human rights commission (the commission). The plaintiffs, sixteen registered voters in Worcester, desire a declaration that the ordinance validly conferred the subpoena power on the commission.[1] The defendants, who are the city of Worcester and its city council, have expanded the scope of the declaratory relief

---

[1] On leave of court, ten or more registered voters have the right to file a bill on behalf of the public for declaratory relief under G. L. c. 231A, inserted by St. 1945, c. 582, § 1. See G. L. c. 43B, § 14 (2), inserted by St. 1966, c. 734, § 1, as amended. Proceedings seeking a determination of the validity of a municipal ordinance may properly be brought under G. L. c. 231A, § 2.

sought by the plaintiffs and seek a declaration that the entire ordinance is void as beyond the power of the city council to adopt. The Massachusetts Commission Against Discrimination (MCAD) has submitted a brief as a friend of the court in support of the proposition that a municipality may properly enact an ordinance in the area of human rights.

To resolve the issues presented in this proceeding we must consider the authority of Massachusetts municipalities to adopt local ordinances and by-laws following the material changes which were made in art. 2 of the Amendments to the Constitution of the Commonwealth by the ratification in 1966 of art. 89 of the Amendments, commonly referred to as the Home Rule Amendment.

## THE ORDINANCE.

In February of 1971, the Worcester city council adopted, as part of the city's revised ordinances, an ordinance establishing a human rights commission and an advisory human rights committee. The stated policy of the ordinance is "to see that each individual regardless of his race, color, religious creed, national origin, sex, age or ancestry, shall have equal opportunity in or access to employment, housing, education, recreation and public accommodations; to assure that each individual shall have equal access to and benefit from all public services; to protect each individual in the enjoyment of his civil rights; and to encourage and bring about mutual understanding and respect among all individuals in the City by the elimination of prejudice, intolerance, bigotry, discrimination and the disorder occasioned thereby." See § 1 of the ordinance. A five member human rights commission, to be appointed by the city manager, was given specific powers and duties in implementing the policy of the ordinance.[2]

[2] Section 5 of the ordinance, which deals with the function of the commission and its powers and duties, reads as follows:

"The function of the Commission shall be to implement the policy of this ordinance by the exercise of the following powers and duties:

The commission has been given the power and duty to receive and investigate complaints, and to initiate its own investigation, of the following subjects: (a) discrimination in employment, housing, education, recreation and public accommodations where the discrimination is based on race, color, religious creed, national origin, sex, age or ancestry; (b) denial of equal access to and benefit from public services; (c) violation of the civil rights of any person or group; and (d) the presence in the city of prejudice, intolerance, bigotry, discrimination and the disorder occasioned thereby. See § 5 (1).

The commission, acting by a majority of its members, is given the power to attempt by mediation to resolve any complaint within its jurisdiction and to recommend to the city manager or any governmental agency, such action "as it feels will resolve any such complaint." The

"(1) To receive and investigate complaints of, and to initiate its own investigation of (a) the denial of equal access to, and discrimination in employment, housing, education, recreation and public accommodations (regardless of the public or private source of such denial and discrimination) where such denial or discrimination against either an individual or a group is based on race, color, religious creed, national origin, sex, age or ancestry; (b) denial to any person or group of equal access to and benefit from all public services; (c) violation of the enjoyment and exercise by any person or group of his or its civil rights; and (d) the presence in the City of prejudice, intolerance, bigotry, discrimination and the disorder occasioned thereby.

"(2) To attempt by mediation to resolve any complaint over which it has jurisdiction and to recommend to the City Manager or other appropriate governmental agency, federal, state or local, such action as it feels will resolve any such complaint and, in the case of any unresolved complaint or in the case of any investigation which would be aided thereby, to hold hearings, subpoena witnesses, compel their attendance, administer oaths, take the testimony of any person under oath and in connection therewith to require the production of any evidence relating to any matter in question or under investigation before the Commission. The powers enumerated in this subsection may be exercised by the majority of the members of the commission only. At any hearing before the Commission, or any committee thereof, a witness shall have the right to be advised and represented by counsel present during any hearings.

"(3) After completion of any investigation or hearing on any complaint or matter not resolved by mediation, either (a) to make a written report of its findings and recommendations to the City Manager on any matter within his jurisdiction for his review and for the implementation by him of such of the recommendations of the Commission (including the taking of disciplinary or administrative

commission is also authorized "in the case of any unresolved complaint or in the case of any investigation which would be aided thereby, to hold hearings, subpoena witnesses, compel their attendance, administer oaths, take the testimony of any person under oath and in connection therewith to require the production of any evidence relating to any matter in question or under investigation before the Commission." Any witness is expressly

action) as the City Manager deems justified; or, similarly, to the School Committee on any matter within its jurisdiction; or to the Massachusetts Commission Against Discrimination (MCAD) on any matter within its jurisdiction; or to any court or other governmental agency having jurisdiction of the matter in question, and in all cases, urging, and using its best efforts to bring about, compliance with its recommendations; or (b) to represent or cause to be represented any complainant who, in the opinion of the Commission, has a justifiable complaint which involves a matter outside the jurisdiction of the City Manager yet one which is within the jurisdiction of the Commission but must be presented and processed by the complainant before the MCAD or some other state or federal governmental agency or court, provided, however that the Commission shall provide such representation only for those complainants for whom undue hardship in the opinion of the Commission would otherwise result. In the conduct of any mediation, investigation, hearing, or representation of any complainant, the Commission may utilize not only the members and staff of the Commission but such organizations as the Worcester County Bar Association, the Worcester Legal Aid Society, the Neighborhood Legal Services of the Community Action Council, the National Center for Dispute Settlement of the American Arbitration Association, and any other similar organization.

"(4) To issue such publications and such results of investigations and research as in its judgment will tend to promote good will and minimize or eliminate discriminaton because of race, color, religious creed, national origin, sex, age, or ancestry; provided, however, that no publication or results of investigation or research shall be issued pending the investigation or the outcome of a criminal trial in which a member or members of the Worcester Police Department or other police agencies of the Commonwealth of Massachusetts or federal police agencies are involved, provided that publication or results of investigation or research may be issued after the termination of any such trial in the Central District Court of Worcester; which trial was not duly appealed to the Superior Court or after the conclusion of any such trial in the Superior Court, and then only through the office of the City Manager.

"(5) To cooperate with federal, state and City agencies, including the School Department and the MCAD, in developing courses of instruction for presentation in public and private schools, public libraries, and other suitable places, devoted to eliminating prejudice, intolerance, bigotry and discrimination and showing the need for mutual self-respect and the achievement of harmonious intergroup relationship in the City of Worcester, and to enlist the cooperation of the various racial, religious and ethnic groups, civic and community organizations, labor organizations, fraternal and benevolent organizations and other groups to effectuate the policy of this ordinance.

granted the right to be advised and represented by counsel present during any hearing. See § 5 (2).[3]

After the completion of any investigation or hearing on any complaint or matter not resolved by mediation, the commission has the duty either (a) to make a written report of its findings and recommendations to the city manager, the school committee, the MCAD or other governmental agency having jurisdiction of the matter in question or (b) "to represent or cause to be represented any complainant who, in the opinion of the Commission, has a justifiable complaint which involves a matter outside the jurisdiction of the City Manager yet . . . within the jurisdiction of the Commission . . . [which] must be presented and processed by the complainant before the MCAD or some other state or federal governmental agency or court . . . ." Representation by the commission may be provided only for those complainants for whom undue hardship would otherwise result. See § 5 (3).

The commission additionally may under certain limitations issue publications and the results of investigations and research, if it will tend to promote good will and minimize or eliminate discrimination. See § 5 (4). The commission also has authority to coöperate with Federal, State and city agencies in developing certain courses

"(6) To create such sub-committees from the members of the Commission and the Committee as in the Commission's judgment will best aid in effectuating the policy of this ordinance and to empower such sub-committees to study the problems of prejudice, intolerance, bigotry, and discrimination prevailing in the City of Worcester.

"(7) To make such recommendations to the City Manager as in its judgment will effectuate the policy of this ordinance and annually to make a written report to the City Manager of its activities.

"(8) To perform such other duties as may be prescribed under law."

[3] A footnote to cl. (2) which purports to be a part of the ordinance as presented to this court states that "[t]he Ad Hoc Human Rights Committee recommends that the foregoing Subsection (2) be included in the ordinance with the understanding that the subpoena power will not be used until a declaratory judgment has been obtained declaring valid the use of the subpoena power, or that the General Court has passed legislation permitting such use." Although the ad hoc human rights committee is not described in the record, we assume it was a committee of Worcester citizens who worked for the adoption of a human rights ordinance by the city.

of instruction and to enlist the coöperation of various groups to effectuate the policy of the ordinance. See § 5 (5).

The ordinance provides for the appointment of an executive director of the commission to serve as its executive officer and for the appointment of a fifteen member advisory committee to the commission. The services of all city departments are to be available to the commission subject to the approval of the city manager or the school committee. The commission is required to adopt rules of procedure for the conduct of its investigation and hearings. The rules must "ensure the due process rights of all persons involved in the investigations and hearings." Each person who appears before the commission and avails himself of "constitutional guarantees shall not be punished in any way" therefor.

Section 11 of the ordinance provides that "[n]othing in this ordinance shall be interpreted to contravene the General Laws of this Commonwealth." Section 12 contains a severability clause.

In general terms the ordinance grants broad investigatory powers to the commission, including the right to hold hearings. It also grants the power to attempt to mediate disputes without any right to require any person to participate in those mediation efforts. Although the commission may assist a person in advancing a justifiable complaint to the appropriate local, State or Federal agency or to a court, the commission has no authority to compel compliance, or punish for non-compliance, with any local ordinance or any State or Federal law relating to unlawful discrimination.

### THE CONTROVERSY.

Following the adoption of the ordinance the commission requested the city council to appropriate funds to pay bills "for serving subpoenas for the Human Rights Commission and witness fees." The city solicitor rendered an opinion "to the effect that Section 5 (2) is in-

valid and that it would be illegal to appropriate funds for serving and processing subpoenas." The council tabled the request "until the controversy over the validity of Section 5 (2) has been resolved."

The opinion of the city solicitor is before us. It consists of a November, 1970, memorandum to the city solicitor from a legal assistant (prepared prior to the enactment of the ordinance) and deals not with the "validity of Section 5 (2)" as such but with the right of the commission to subpoena witnesses. From the date of the memorandum and from the pre-enactment recommendation of an ad hoc committee that the subpoena power not be used until a judicial determination (or legislation) clarifies the question, it is apparent that the issue of the right of the commission to use the subpoena power is one of long standing. The larger claim that the city had no authority to adopt such an ordinance at all appears to be a controversy of more recent origin, although it is now pressed with considerable vigor by the city.

The arguments of the city in opposition to the ordinance as a whole and to the right of the commission to use the subpoena power rest on substantially the same reasoning. All parties correctly recognize that the legislative powers of Massachusetts municipalities were materially affected by the Home Rule Amendment and by the enactment of the Home Rule Procedures Act (G. L. c. 43B). See *Answer of the Justices*, 356 Mass. 769, 770–771.[4]

---

[4] The provisions of the Home Rule Amendment which deal with local legislative powers have their origins in the so called "self-executing" home rule proposal of the American Municipal Association, which is now the National League of Cities. See 1961 Senate Doc. No. 580, pp. 96–97; 1966 Senate Doc. No. 846, pp. 17–18. That proposal called "for a sharing of legislative power, rather than for the separation of powers between state and local levels." 1965 Senate Doc. No. 950, p. 49. Because on the adoption of such a Home Rule Amendment, a municipality may act under the amendment without any intervening legislative action, the National League of Cities' proposal has been described as "self-executing." Such a "self-executing" form of home rule provision is not the most common form of constitutional provision concerning municipal legislative authority, but it has been described as "the strongest type of home rule." *Id.* at pp. 65–66.

The city contends in part that the city council had no authority to enact the ordinance because the city purported to exercise a power or function which, under § 6 of the Home Rule Amendment and § 13 of the Home Rule Procedures Act, was "inconsistent" with the General Laws enacted by the General Court on the subject of human rights. The city points to G. L. c. 151B which makes unlawful certain practices which discriminate because of "race, color, religious creed, national origin, sex, age, or ancestry." G. L. c. 151B, § 4, inserted by St. 1946, c. 368, § 4, as amended. Chapter 151B authorizes the MCAD to investigate complaints, to subpoena witnesses, to compel their attendance, to hold hearings, to issue orders and to seek judicial relief, and further directs the MCAD to formulate policies to effectuate the purpose of the chapter.[5] Additionally, the city asserts that the power purported to be exercised by the ordinance is inconsistent with the provisions of c. 151C which forbids unfair educational practices and grants to the MCAD the power to investigate and to hold hearings with respect to unfair educational practices. Among other things, it is generally an unfair educational practice for an educational institution to discriminate against any citizen seeking admisson as a student, "because of race, religion, creed, color or national origin."

As to the subpoena power, the city asserts that G. L. c. 233, § 8, as most recently amended by St. 1949, c. 292, grants certain State and local agencies the right to summon witnesses and that a local human rights commission

Although substantial legislative authority devolves upon local governments automatically on the adoption of such a self-executing home rule amendment, the Legislature by positive enactments may restrict local legislative action or deny municipalities power to act at all in certain areas. 1966 Senate Doc. No. 846, p. 18. In fact, the self-executing proposal of the National League of Cities has been criticised because by a single positive, broad enactment a State Legislature may deny municipalities all power to legislate under the home rule provision. Home Rule–NML Model, 44 Natl. Municipal Rev. 132, 133.

[5] From the similarity of language between certain provisions in the ordinance and G. L. c. 151B it is clear that the draftsmen of the ordinance had G. L. c. 151B before them.

is not mentioned in that section. From this circumstance the city argues that only agencies listed in G. L. c. 233, § 8, were intended by the Legislature to have subpoena powers and the grant of the subpoena power to the commission is inconsistent with G. L. c. 233, § 8.

The city asserts, in addition, that even if the ordinance is not inconsistent with any general law, no such ordinance may properly be adopted because under § 7 (5) of the Home Rule Amendment no municipality may "enact private or civil law governing civil relationships except as an incident to an exercise of an independent municipal power." On the ground that the ordinance governs civil relationships, and it is not incident to an exercise of an independent municipal power, the city asserts that the ordinance is invalid.

Section 6 of the Home Rule Amendment provides in part that "[a]ny city or town may, by the adoption, amendment, or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it, *which is not inconsistent with the constitution or laws enacted by the general court in conformity with powers reserved to the general court by section eight . . .*" (emphasis supplied). Section 8 of the Home Rule Amendment expressly provides that "[t]he general court shall have the power to act in relation to cities and towns, but only by general laws which apply alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two . . .." Section 13 of the Home Rule Procedures Act repeats substantially all the language of § 6 of the Home Rule Amendment, and in addition it provides in part that "[n]othing in this section shall be construed to permit any city or town, by ordinance or by-law, to exercise any power or function which is inconsistent with any general law enacted by the general court before November eighth, nineteen hundred and sixty-six which applies alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two." The Home Rule Proce-

dures Act is a general law itself, with which the exercise of any power or function by a local ordinance or by-law must be "not inconsistent."

The plaintiffs, of course, deny that there is any inconsistency between the powers exercised by the ordinance and any general law. Moreover, they contend that the ordinance does not "govern" any civil relationship, and that, in any event, any effect on civil relationships is permitted under § 7 of the Home Rule Amendment because it is "incidental to the exercise of an independent municipal power."

### SECTION 7 (5).

By the adoption of the ordinance the city has not violated § 7 (5) of the Home Rule Amendment.[6] In the absence of authorizing legislation, § 7 (5) bars a municipality from enacting "private or civil law governing civil relationships except as an incident to an exercise of an independent municipal power."

The ordinance sets forth no "private or civil law" which "governs" civil relationships. It is concerned at most with adherence by persons in the city to those laws relating to unlawful discrimination which are already in effect and which do govern their civil relationships. The law governing civil relationships between persons, such as between landlords and present or prospective tenants and between employers and present or prospective employees, is wholly unaffected by the ordinance. No new rights or obligations between persons are created by the ordinance; no existing rights or obligations between persons are modified or abolished.

Admittedly, the Worcester ordinance may have some impact on civil relationships. That is what it is intended to do. By its investigatory and advisory functions, by mediation and persuasion and by its effect on public opin-

---

[6] For a discussion of the general subject of home rule powers and the effect of local ordinances and by-laws on civil relationships, see Municipal Home Rule Power: Impact on Private Legal Relationships, 56 Iowa L. Rev. 631.

ion, the commission may well influence the conduct of persons in their civil relationships. At the most, however, the existence of the ordinance and activities undertaken pursuant to it can encourage a person by moral suasion to do what the law governing his civil relationships already requires him to do.

The situation presented by the Worcester ordinance is very different from the one with which this court was concerned in *Marshal House, Inc.* v. *Rent Review & Grievance Bd. of Brookline*, 357 Mass. 709. There we held that the Brookline rent control by-law, in the absence of an explicit delegation of authority by the Legislature, so directly affected the landlord-tenant relationship, otherwise than "as an incident to an exercise of an independent municipal power," as to violate the restriction set forth in § 7 (5). The Brookline by-law afforded a local board "power in effect to remake, in important respects, the parties' contract creating a tenancy." *Id.* at 716. No such circumstance exists under the Worcester ordinance.

Because we hold that the ordinance does not involve the enactment of any private or civil law governing civil relationships, we need not consider whether, if it did involve such an enactment, the ordinance would nevertheless be valid on the ground that, in the words of § 7 (5), the enactment of such a private or civil law was "as an incident to an exercise of an independent municipal power." See *Marshal House, Inc.* v. *Rent Review & Grievance Bd. of Brookline*, 357 Mass. 709, 717–718.

What we have said about the validity of the ordinance in general, in the face of the limitations of § 7 (5), disposes of any claim that the granting of the subpoena power to the commission violates the restrictions of § 7 (5). The grant of the right to use the subpoena power is not an enactment of "private or civil law," nor are civil relationships in any way "governed" by the exercise of that right.

SECTION 13 OF THE HOME RULE PROCEDURES ACT.

There is only one seriously disputable issue with re-

spect to the authority of the city to adopt the ordinance pursuant to § 13 of the Home Rule Procedures Act. That question is whether the city has exercised a power or function "which is not inconsistent" with general laws.

In all other respects, § 13, which is set forth in full in the margin,[7] authorizes the enactment of the ordinance, including the provision granting the commission the right to use the subpoena power. The ordinance is a "local" ordinance in the words of § 13 in that it deals with a problem which is local, although the problem is no doubt found in varying degrees throughout the State.[8]

---

[7] G. L. c. 43B, § 13 (inserted by St. 1966, c. 734, § 1). "Any city or town may, by the adoption, amendment or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it, which is not inconsistent with the constitution or laws enacted by the general court in conformity with powers reserved to the general court by Section 8 of Article LXXXIX of the Amendments to the Constitution and which is not denied, either expressly or by clear implication, to the city or town by its charter. Whenever appropriations, appointments, orders, regulations or other legislative or executive actions within the scope of any such ordinance or by-law are necessary in the exercise of any power or function authorized by such ordinance or by-law, any such actions which are to be taken by a city council or town meeting may be taken by ordinance, by-law, resolution, order or vote, and any such actions which are to be taken by executive officers may be taken in any appropriate manner, subject, however, as to both such categories, to all provisions of the ordinance or by-law in question, the city or town charter, and other applicable law. Any requirement that an ordinance or by-law be entitled as such, or that it contain the word 'ordained,' 'enacted' or words of similar import shall not affect the validity of any action which is required to be taken by ordinance or by-law. Nothing in this section shall be construed to permit any city or town, by ordinance or by-law, to exercise any power or function which is inconsistent with any general law enacted by the general court before November eighth, nineteen hundred and sixty-six which applies alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two. No exercise of a power or function denied to the city or town, expressly or by clear implication, by special laws having the force of a charter under section nine of said Article, and no change in the composition, mode of election or appointment, or terms of office of the legislative body, the mayor or city manager or the board of selectmen or town manager, may be accomplished by by-law or ordinance. Such special laws may be made inapplicable, and such changes may be accomplished, only under procedure for the adoption, revision or amendment of a charter under this chapter."

[8] "Civil rights is an area in which local initiative is particularly appropriate. The type and extent of discriminatory practices in a given community vary in relation to such factors as the depth of local prejudice and the physical environment. These, in turn, are affected by the character of the municipality and the number of citizens against whom discriminatory actions might be expected. The most basic decision turning on the above factors is whether or not to enact

Clearly the Legislature "has the power to confer" on municipalities the right to enact ordinances of the type involved in this case. Finally, the power exercised by the ordinance is "not denied, either expressly or by clear implication, to the city . . . by its charter." See G. L. c. 43, §§ 1–45, 93–116 (commonly known as Plan "E").

We come then to the meaning of the word "inconsistent" in § 13 of the Home Rule Procedures Act, and in § 6 of the Home Rule Amendment, each of which authorizes any city or town to adopt local ordinances or by-laws so as to exercise *"any power or function* which the general court has power to confer upon it, *which is not inconsistent with* the constitution or *laws enacted by the general court* in conformity with powers reserved to the general court by section eight . . . " (emphasis supplied).

In determining whether a local ordinance is inconsistent with "laws enacted by the general court in conformity with powers reserved to the general court by section eight" of the Home Rule Amendment, we believe that general laws enacted prior to the adoption of the Home Rule Amendment must be considered as well as those general laws which have been enacted since its adoption. To be sure, literally no general law enacted before the effectiveness of the Home Rule Amendment could have been *enacted* in conformity with powers reserved to the Legislature by § 8 of the Home Rule Amendment. However, there is no reasonable basis to interpret the Home Rule Amendment as making ineffective all those general laws concerning cities and towns which were enacted prior to the adoption of the Home Rule Amendment. See 1967 Senate Doc. No. 1547, p. 10. Moreover, language in the Home Rule Procedures Act shows that the Legislature intended that pre-Home Rule Amendment general laws be fully applicable to municipalities in the exercise of their legislative powers under § 6 of the Home Rule

a civil rights ordinance in the first place. The importance of familiarity with local conditions, however, does not end there. Such familiarity is also vital to the actual composition of an effective civil rights ordinance." Municipal Civil Rights Legislation — Is the Power Conferred by the Grant of Home Rule? 53 Minn. L. Rev. 342, 345.

Amendment.  See G. L. c. 43B, § 13.  See also 1967 Senate Doc. No. 1547, p. 57.  The fourth sentence of § 13 provides that "[n]othing in this section shall be construed to. permit any city or town, by ordinance or by-law, to exercise any power or function which is inconsistent with any general law enacted . . . before . . . [the adoption of the Home Rule Amendment] which applies alike to all cities, or to all towns, or to all cities and towns, or to a class of not fewer than two."  We interpret that language in § 13 as stating, in a backhanded way, that the exercise of municipal legislative authority under § 13 of the Home Rule Procedures Act may not properly involve the exercise of any power or function which is inconsistent with any pre-Home Rule Amendment general law.

In defining the standard against which this court should decide whether a particular power or function exercised in a local ordinance or by-law is inconsistent with the general laws, considerable assistance can be derived from judicial treatment of two analogous situations.  One such situation arises when it is asserted that Federal legislation has preëmpted a particular field so that State legislation in the same field is barred.[9]  The other analogous situation has existed in this State when it has been asserted that a local ordinance or by-law is invalid because it was enacted in violation of a statute which allowed local regulation only if "not repugnant

---

[9] The First Report of the Special Commission on Implementation of the Municipal Home Rule Amendment recognized the resemblance between the legislative power of localities under the Home Rule Amendment and the power of States to legislate in areas where the Federal government may assert its supremacy. 1966 Senate Doc. No. 846, p. 18.  In discussing the proposed amendment the Special Commission on Implementation of the Municipal Home Rule Amendment said (p. 18): "Full legislative authority is granted to the localities, subject to control by the state legislature through positive enactments which restrict local legislative action or which deny power to local governments to act in certain areas. This practice resembles the federal practice of allowing states to act in areas of federal concern until Congress preëmpts such areas with a Federal statute." For earlier preamendment statements to much the same effect, see 1961 Senate Doc. No. 580, p. 96, and 1965 Senate Doc. No. 950, pp. 24 and 123.

to law" (G. L. c. 40, § 21) or only if not "inconsistent" with the laws of the Commonwealth.[10]

### The Analogy of Federal Preëmption Cases.

Cases involving the question whether State legislation on a particular subject is forbidden because Congress has preëmpted the field suggest a reasonable standard to be applied in determining whether a power or function exercised by a locality is inconsistent with any of our General Laws. In this connection the Supreme Court has said that the exercise of Federal supremacy is not lightly to be presumed, and that Congress must clearly manifest its intention to supersede the exercise of the power of the State. *Schwartz* v. *Texas*, 344 U. S. 199, 202–203. In *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142, recognizing that there is no preëmption unless the nature of the regulated subject matter permits no other conclusion or Congress has so ordained, the court pointed out that the test whether both Federal and State legislation may operate is whether both can be enforced without impairing the Federal superintendence of the field. Put in other words, the question is whether a challenged State statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67. See *Perez* v. *Campbell*, 402 U. S. 637, 649.

If, of course, "Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition . . .." *Charleston & Western Carolina R.R.* v. *Varnville Furniture Co.* 237 U. S. 597, 604. The ques-

---

[10] In dealing with a statute which allowed local regulations "not inconsistent" with certain State statutes and regulations, this court recognized that the issue before it was "more or less analogous to the power of the State to make regulations for certain phases of interstate commerce, which are valid until they are displaced or abrogated by an Act of Congress regulating these same phases." *Milton* v. *Donnelly*, 306 Mass. 451, 458.

tion for decision in each instance of parallel legislation is whether Congress has in fact "taken the . . . matter in hand." See *Head* v. *New Mexico Bd. of Examrs. in Optometry,* 374 U. S. 424, 430. In *Colorado Anti-Discrimination Commn.* v. *Continental Air Lines, Inc.* 372 U. S. 714, 722–724, the Supreme Court rejected a contention that a Colorado anti-discrimination statute operated in an area preëmpted by Federal legislation. Dealing with circumstances which we view as similar to the State and local relationship involved in the case before us, the Supreme Court said (p. 722) that "[t]o hold that a state statute identical in purpose with a federal statute is invalid under the Supremacy Clause, we must be able to conclude that the purpose of the federal statute would to some extent be frustrated by the state statute." The Supreme Court concluded that Federal legislation concerning discrimination on account of race in hiring and employment was not frustrated by the State statute and that there was no express or implied Congressional intent to bar State legislation in the same field.

Although the standard to be applied in determining whether Congress has preëmpted a given field is generally agreed on, the application of that standard to a specific circumstance often results in disagreement. See, e.g., *California* v. *Zook,* 336 U. S. 725, 729, 752 (5–4 decision). There is, however, as Mr. Justice Holmes said, no way to resolve such disputes except by making a judgment on each particular case. *Pennsylvania R.R.* v. *Public Serv. Commn.* 250 U. S. 566, 569.

> *The Analogy of Decisions Concerning the Compatibility of Pre-Home Rule Amendment By-Laws and Statutes.*

In determining whether a local regulation is "inconsistent" with or "repugnant" to State legislation, this court has dealt with problems which are much like the one before us for decision.[11] Since our earliest history

---

[11] Although the word "repugnant" may suggest to some a greater degree of incompatibility than does the word "inconsistent," it is not

there has been legislation in effect, similar to G. L. c. 40, § 21, which provides that towns may for certain listed purposes make such by-laws, "not repugnant to law," as they may judge most conducive to their welfare. *Commonwealth* v. *Baronas*, 285 Mass. 321, 322. The court, in the *Baronas* case, set forth principles applicable in determining whether a local by-law was "repugnant to law." "The mere existence of statutory provision for some matters within the purview of the by-law will not render it invalid as repugnant to law." *Id.* at 323. On the other hand, "where by legislation a subject matter has been fully dealt with, a by-law of a town or city dealing further and otherwise with that subject matter is 'repugnant to law' within the meaning of this statute." *Id.* at 322. In the *Baronas* case a conviction under a by-law forbidding any person to have any intoxicating liquor in his possession in any park or public place was upheld. Recognizing that "the possession, use, sale and keeping of intoxicating liquors have been fully covered by the legislation of the Commonwealth" and that the State legislation did not prohibit the possession of intoxicating liquors, the court concluded the local by-law was nevertheless not invalid as "repugnant to law." For other examples of local regulations held to be valid in the face of State legislation bearing on the same subject, see *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 135–136 (State statute does not "declare or imply" that further local regulations may not be made concerning the wrapping of bakery products upon sale) and *Brown* v. *Carlisle*, 336 Mass. 147 (local regulation of the discharge of firearms not forbidden in spite of extensive State regulation of hunting).

In *Commonwealth* v. *Goodnow*, 117 Mass. 114, this

---

clear that any significant difference between the two words has been recognized in interpreting statutes in this area. See *Milton* v. *Donnelly*, 306 Mass. 451, 458 (by-law held to be "not repugnant" to State regulation with which it was not permitted to be "inconsistent"); *Brown* v. *Carlisle*, 336 Mass. 147 (by-law, which could not be "repugnant to law," described as having no inconsistency with State statutes).

court considered the legality of a Boston ordinance which the defendant claimed was void because it was inconsistent with a State statute. The defendant had been convicted of constructing a window which projected over a street in violation of a city ordinance which prohibited the construction of any window which projected into any street. Cities had general authority to enact such ordinances, and Boston was authorized under its charter to make "all needful and salutary by-laws and ordinances not inconsistent with the laws of the Commonwealth, as towns and cities have authority to make." State legislation prohibited any person from erecting or maintaining a bow window which projected into the streets of Boston more than one foot beyond the front of his house. Rejecting the implication that the State statute allowed windows in Boston to project one foot into the street, the court held that the Boston ordinance was "in no proper sense inconsistent" with the State statute. *Id.* at 116.

As a general proposition the cases dealing with the repugnancy or inconsistency of local regulations with State statutes have given considerable latitude to municipalities, requiring a sharp conflict between the local and State provisions before the local regulation has been held invalid. On the other hand, where the Legislature had enacted "a complete and comprehensive statutory system" on a subject, it was said before the Home Rule Amendment that there was no room for local ordinances or by-laws. *Commonwealth* v. *Wolbarst,* 319 Mass. 291, 295. *Southborough* v. *Boston & Worcester St. Ry.* 250 Mass. 234, 239. Moreover, local regulations running directly contrary to the provisions of a State statute have not been able to survive the test of "repugnancy." See, e.g., *Greene* v. *Mayor of Fitchburg,* 219 Mass. 121, 124–125.[12]

---

[12] The issue of the repugnancy of a municipal ordinance or by-law to State legislation is completely separate from any question as to the authority of the municipality to act if there were no asserted repugnancy to State legislation. See *Commonwealth* v. *Turner,* 1 Cush. 493, 496. In the "repugnancy" cases, as in the case before this court, the municipality has the authority to act on the subject matter unless the existence of State legislation forbids that action.

### The Standard for Determining Inconsistency.

In determining whether a local ordinance or by-law is "not inconsistent" with any general law within the meaning of those words in § 6 of the Home Rule Amendment and in § 13 of the Home Rule Procedures Act, the same process of ascertaining legislative intent must be performed as has been performed in the Federal preëmption cases and in our own cases involving "inconsistent" or "repugnant" local ordinances or by-laws. The legislative intent to preclude local action must be clear.[13] If the Legislature has made no explicit indication of its intention in this respect, a legislative intention to bar local ordinances and by-laws purporting to exercise a power or function on the same subject as State legislation may nevertheless be inferred in all the circumstances.

Legislation which deals with a subject comprehensively, describing (perhaps among other things) what municipalities can and cannot do, may reasonably be inferred as intended to preclude the exercise of any local power or function on the same subject because otherwise the legislative purpose of that statute would be frustrated. For example, even if § 7 of the Home Rule Amendment did not deny municipalities the power to borrow money or to levy, assess and collect taxes except pursuant to legislative authority, the existing general laws concerning those subjects are so comprehensive that an inference that the Legislature intended to preëmpt those fields would be fully justified.

A conclusion that the Legislature intended to preëmpt a subject may also be inferred if the Legislature has explicitly limited the manner in which cities and towns may act on that subject. For example, State statutes which are effective upon acceptance by a municipality often are less than comprehensive, but are intended by implication to limit local action following their acceptance. See *Chief*

---

[13] The Legislature may, of course, explicitly forbid certain local action. For a post-Home Rule Amendment statute explicitly restricting certain action by municipalities, see St. 1967, c. 373.

*of Police of Dracut* v. *Dracut*, 357 Mass. 492, where a town meeting vote to rescind acceptance of a State statute (c. 41, § 97A) was held to be ineffective under § 13 of the Home Rule Procedures Act because such action was inconsistent with the statute, previously accepted by the town, which set forth certain rights and responsibilities concerning the police department "[i]n any town which accepts this section." [14]

The existence of legislation on a subject, however, is not necessarily a bar to the enactment of local ordinances and by-laws exercising powers or functions with respect to the same subject. If the State legislative purpose can be achieved in the face of a local ordinance or by-law on the same subject, the local ordinance or by-law is not inconsistent with the State legislation, unless the Legislature has expressly forbidden the adoption of local ordinances and by-laws on that subject. [15]

Although constitutional, statutory and other differences among States often make comparisons inappropriate, the standard which we have adopted for determining the consistency of a local ordinance or by-law with a State statute has also been adopted in States having

---

[11] For other examples of legislation from which a legislative intention to restrict or forbid *contrary* local ordinances or by-laws may clearly be inferred, see G. L. c. 39, § 8, denying city council members eligibility to any other office whose salary is payable by the city; G. L. c. 39, § 9, restricting the months during which a town may hold an annual town meeting; G. L. c. 39, § 10, concerning town meeting warrants and special town meetings; G. L. c. 40, § 5B, concerning (in part) the maximum amounts which *may* be appropriated to stabilization funds, and G. L. c. 40, § 6, similarly concerned with reserve funds; and G. L. c. 40, § 54, denying the right to issue certain building permits in the absence of a supply of water.

[15] In a comment on the legislative rights of municipalities under § 6 of the Home Rule Amendment, it has been said that "[g]enerally speaking, it is agreed by most home rule students that unless a state statute clearly limits local actions by use of the directive word *shall* (as opposed to the permissive word *may*) or by use of the phrase *but only in the manner hereinafter provided*, or similar words of exclusion, municipalities may do other than is as provided by that statute – unless the state legislation so broadly encompasses the field as to indicate a clear intention to preëmpt the matter as an area of complete state concern. . . .." Gere and Curran, Home Rule (Bureau of Pub. Affairs, Boston College and Bureau of Govt. Research, U. of Mass.) 36.

closely analogous constitutional or statutory provisions concerning the legislative power of municipalities. See, e.g., *Rubey* v. *Fairbanks*, 456 P. 2d 470, 475 (Alaska); *Wagstaff* v. *Groves*, 419 S. W. 2d 441, 443 (Tex. Civ. App.); *Lenci* v. *Seattle*, 63 Wash. 2d 664, 667, 669–670.

The application of these principles to general laws adopted prior to the enactment of the Home Rule Amendment may present special difficulties in specific cases. Many pre-Home Rule Amendment general laws were necessary to grant powers to municipalities under the now discarded policy that a municipality "has only those powers which are expressly conferred by statute or necessarily implied from those expressly conferred or from undoubted municipal rights or privileges." *Atherton* v. *Selectmen of Bourne*, 337 Mass. 250, 255–256. Obviously, many pre-Home Rule Amendment statutes granting authority to municipalities were rendered unnecessary by the Home Rule Amendment. We are not inclined to attribute to permissive statutes of that type a limiting function upon the powers of municipalities under the Home Rule Amendment or under the parallel language of § 13 of the Home Rule Procedures Act. Were we to infer such a limiting function from the existence of such permissive statutes, the result would be that the legislative powers of municipalities would be restricted precisely to those which they had at the time of the adoption of the Home Rule Amendment. That was not the purpose of the voters in adopting the Home Rule Amendment, and no such purpose can be found in the Home Rule Procedures Act or in any other legislation passed since the adoption of the Home Rule Amendment.[16]

---

[16] A theoretical problem exists in undertaking to ascertain the intention of the Legislature concerning the preëmption of the field by a pre-Home Rule Amendment statute, when quite obviously the Legislature had no intention on the issue because the preëmption question did not exist at the time of the enactment of the statute. This theoretical difficulty can be resolved by applying the test whether the local ordinance or by-law frustrates the fulfilment of the legislative purpose of any arguably relevant general law.

*The Ordinance as a Whole.*

In deciding whether the activities of the Worcester commission will in any way frustrate the achievement of any statutory purpose, it is important to keep in mind precisely what the Worcester commission may and may not do. Although the policy of the city expressed in § 1 of the ordinance is broad, the action which may be taken by the commission to carry out that policy is limited. The commission has no authority to determine violations of substantive rights. It cannot intrude into the activities of the MCAD or any agency or court in this respect. The commission may investigate certain matters, and it may attempt by mediation to resolve any complaint in its area of jurisdiction. It may, moreover, recommend to other governmental agencies, including the MCAD, action which it believes will resolve any such complaint.

The commission may in its discretion hold hearings. As part of any hearing process, if a majority of its members agrees, the commission may "subpoena witnesses, compel their attendance, administer oaths, [and] take the testimony of any person under oath . . . ." The subpoena power is granted only to the commission; no person appearing at any commission hearing has the authority to subpoena witnesses. See *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Ins.* 329 Mass. 265, 278–279. Any person summoned by the commission to appear at a hearing is explicitly granted the right to counsel. The commission must adopt rules of procedure for its hearings which "shall ensure the due process rights of all persons . . . ." See § 10.

The ordinance as a whole was properly adopted by the city under § 6 of the Home Rule Amendment and § 13 of the Home Rule Procedures Act. The legislative purposes of G. L. c. 151B (concerning unlawful discrimination because of race, color, and so forth) and of G. L. c. 151C (concerning unfair educational prac-

tices because of similar discrimination) will not be thwarted by the local activities permitted by the ordinance. Certainly there is no express legislative intent to prevent local ordinances and by-laws designed to assist in the fulfilment of the legislative goals expressed in G. L. c. 151B and G. L. c. 151C.

There is no basis for implying a legislative intention to limit local regulations on the subjects dealt with in G. L. c. 151B and G. L. c. 151C. We do not infer any such limitation, as the city urges, because of the explicit authority of the MCAD to create and empower local agencies "to study the problems of discrimination in all or specific fields of human relationships or in specific instances of discrimination . . . and make recommendations to the commission for the development of policies and procedures in general and in specific instances . . . ." See G. L. c. 151B, § 3, cl. 8. The legislative purpose in authorizing such local agencies was to permit a local study of the problems of discrimination and to obtain recommendations for the MCAD which would assist the MCAD in the performance of its duties. Any studies and recommendations made by the commission will be consistent with the legislative purpose to permit local study and to obtain recommendations on the local level. To the extent that the commission exercises powers and functions beyond the range of the statutory authority of any local agency which might be appointed by the MCAD, the commission's activities will not be inconsistent with G. L. c. 151B if the legislative purpose of G. L. c. 151B can nevertheless be achieved. On the record before us we see no way by which any purpose of G. L. c. 151B (or any other general law) will be frustrated by the existence of the commission or by its operation in any area of authorized activity.

The contention of the plaintiffs that the powers exercised in the ordinance are not inconsistent with any general law is supported by the argument of the MCAD as a friend of the court to the effect that the ordinance

as a whole is valid and that municipalities may adopt ordinances and by-laws concerning human rights, provided the authority and jurisdiction of the MCAD are recognized and respected. Although the views of the State agency on the question of the preëmption of the field by State legislation are, of course, not conclusive, it is an important practical consideration that the State agency charged with the administration of State statutes finds nothing in the Worcester ordinance which it believes will interfere with its attempts to fulfil the legislative purposes of those statutes.

In the absence of any express legislative intent to forbid local activities consistent with the purpose of the State's anti-discrimination legislation, and in the absence of any circumstances from which it appears any legislative purpose of G. L. c. 151B and G. L. c. 151C will be frustrated and from which, therefore, a legislative intent to preëmpt the field must be inferred, we hold that the ordinance as a whole is valid and authorized by law.

## The Subpoena Power.

In order to pass upon the validity of that provision in the ordinance which permits the commission to subpoena witnesses, there must be a clear understanding of the power or function concerning subpoenas which the ordinance purports to exercise. If it rightly has the subpoena power at all, the commission may, of course, exercise that power only on the approval of a majority of its members and only "in the case of any unresolved complaint or in the case of any investigation which would be aided thereby." Any such complaint or investigation could properly deal only with areas as to which the commission is authorized to receive complaints or to initiate investigations.

Any person summoned by the commission may assert the same rights that a person may assert in response to any subpoena. If a person who has been summoned refuses to testify, the commission has no inherent power

of enforcement (see *Whitcomb's Case,* 120 Mass. 118, 123), but it may seek a court order under G. L. c. 233, § 10. See *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Ins.* 329 Mass. 265, 279.[17] At a hearing on such an order, the defendant may assert a variety of arguments designed to persuade the court that as a matter of law or in its discretion no order should be issued. For example, a defendant may challenge the jurisdiction of the commission in the particular circumstances of his case.[18] Additionally, the defendant may argue that his substantive rights in some pending or threatened litigation or agency hearing will be unfairly interfered with by requiring his attendance and his testimony. In any event, whether to issue an order compelling a witness to appear and testify is discretionary with the judge. *Osborne, petitioner,* 141 Mass. 307. See *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Ins.* 329 Mass. 265, 279.

The city asserts that the grant of the subpoena power pursuant to the ordinance is forbidden because G. L. c. 233, § 8, shows that the Legislature "has preëmpted, and thereby abrogated any right which a municipality might have to grant subpoena powers to an agency such as the . . . [commission]." It is clear that the Legislature has not expressly granted the subpoena power to local agencies such as the commission, nor has it expressly authorized municipalities to do so by ordinance or by-law. On the other hand, and equally significant for the purpose of determining the authority of the city to grant the subpoena power to the commission, the Legislature has not expressly denied municipalities the

---

[17] Although the ordinance states that the commission has the right to compel the attendance of witnesses, we do not interpret that provision as granting to the commission any right to compel the attendance of a witness except by way of an application to a Justice of this court or to a judge of the Superior Court under G. L. c. 233, § 10, "for an order compelling attendance and the giving of testimony."

[18] If a proceeding is pending before the MCAD concerning any unlawful practice defined in G. L. c. 151B, that proceeding, while pending, is exclusive and the final determination in the proceeding shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned. G. L. c. 151B, § 9.

right to authorize local agencies by ordinance or by-law to summon witnesses. Thus in the absence of an express legislative statement on the authority of municipalities in this circumstance, we must undertake to see whether any legislative purpose expressed in any general law will be interfered with by the exercise of the power or function granted by the ordinance to subpoena witnesses.

In our view no legislative purpose concerning unlawful discrimination will be affected adversely by the exercise of the subpoena power by the commission. The subpoena power is a procedural tool which the commission may employ in carrying out its general purposes which, as we have held earlier in this opinion, involve the exercise of a power or function which the city could properly assign to the commission. Therefore, any interference with any legislative purpose by reason of the granting or exercising of the subpoena power must be found by implication in the legislative treatment of the subpoena power itself.

Section 8 of G. L. c. 233 is not a comprehensive statute dealing with the subject matter of the subpoena power of municipal agencies. There are some other statutes dealing with the same subject.[19] Section 8, as amended through St. 1949, c. 292, provides in part that "[w]itnesses may be summoned to attend and testify . . . at a hearing before a city council, or either branch thereof, or before a joint or special committee of the same or of either branch thereof, or before a board of selectmen . . . [or before a number of listed local boards or State commissions or commissioners] as to matters within their authority." This language is part of that pre-Home Rule Amendment body of statutory municipal law which was necessary to grant authority to local agencies because the municipalities themselves had no constitutional or legislative authorization to grant

[19] See G. L. c. 40A, § 18 (zoning board of appeals); G. L. c. 41, § 81AA (board of appeals under the subdivision control law); G. L. c. 32, § 20 (5) (b) (local retirement boards).

that authority. We do not see in G. L. c. 233, § 8, and in other statutes concerning the subpoena power of local boards, committees and commissions, a purpose of the Legislatures to restrict municipal agencies in the use of the subpoena power within their respective areas of authority. The Legislature appears to have granted the power of subpoena to any local board which might need it, including selectmen, school boards, boards of registrars of voters, boards of appeals, city councils and any special committee of a city council.[20]

A very different situation would be presented if the Legislature had provided in G. L. c. 233, § 8 (or elsewhere) that witnesses may be summoned to testify *only* before certain listed local agencies, or if that statute had in some other form of words set forth a restriction on the right to use the subpoena power. Where, however, the Legislature has expressly granted the subpoena power to municipal boards which determine substantive rights of persons appearing before them (such as local boards of appeals), it is not logical to infer a legislative intent to deny the subpoena power to a local agency (such as the Worcester commission) which has no authority to determine substantive rights.

We have already held that the provisions of the ordinance are generally valid and that, therefore, the ordinance expresses a valid legislative purpose of the city. The subpoena power, even carefully delimited as we have construed it, may be an important adjunct to the powers of the commission, considering its purposes. Where the local ordinance is wholly consistent with the State legislation on discrimination and the subpoena power may on occasion be necessary to fulfil the pur-

---

[20] If the ordinance had been drafted to give the functions of the commission to a special committee of the Worcester city council, there would have been express legislative authority for that special committee to summon witnesses. G. L. c. 233, § 8. Because of the view we take of the subpoena power authority of the commission, we need not consider whether, even in the absence of the Home Rule Amendment and the Home Rule Procedures Act, the city council could properly delegate to the commission the power of subpoena which the council itself clearly has under G. L. c. 233, § 8.

poses of that ordinance, it is particularly appropriate that the standard we have adopted requires a showing that some purpose of legislation concerning local use of the subpoena power will be frustrated before we must strike down the grant of the subpoena power set forth in the ordinance. We see the exercise of the subpoena power by the commission as interfering with no statutory purpose relating to the use of subpoenas by local boards, committees and commissions. Thus the exercise by the commission of the subpoena power pursuant to the terms of the ordinance is "not inconsistent with . . . laws enacted by the general court" or otherwise invalid under the provisions of § 13 of the Home Rule Procedures Act.

## COSTS.

The plaintiffs ask that they be awarded costs, including reasonable counsel fees. Under the Home Rule Procedures Act persons in the position of the plaintiffs may be awarded costs, including reasonable counsel fees, in the court's discretion. G. L. c. 43B, § 14 (2). The question is whether the plaintiffs or the taxpayers of the city should sustain the plaintiffs' costs in this proceeding. The plaintiffs have acted to uphold a city ordinance which the city itself now argues is invalid, which seemingly the city has been unwilling fully to implement and which has no apparent peculiar benefit, financial or otherwise, to the plaintiffs. These particular facts suggest that the taxpayers of the city, rather than individual citizens, should sustain the plaintiffs' costs, but we may not have all the relevant facts before us. Thus we leave the matter of costs, including reasonable counsel fees, to the discretion of the trial judge.

## CONCLUSION._

A final decree is to be entered (a) declaring that the city of Worcester was properly authorized under G. L. c. 43B, § 13, and § 6 of art. 89 of the Amendments

to the Constitution of the Commonwealth to enact the ordinance, adopted February 2, 1971, establishing a human rights commission and granting the subpoena power to that commission and (b) in the discretion of the court, awarding the plaintiffs their costs, including reasonable counsel fees.

*So ordered.*