F. DOUGLAS COCHRANE *vs.* JOHN B. JANIGAN & others.

Suffolk. March 5, 1962. — May 8, 1962.

Present: WILKINS, C.J., WILLIAMS, CUTTER, KIRK, & SPIEGEL, JJ.

*Contract,* Of indemnity. *Equity Jurisdiction,* Interpleader.

Upon the filing of a bill of interpleader by an escrow agent and payment
into court of the escrow fund, the court, at the request of parties claim-
ing the fund, properly determined not only their claims thereto but also
all other controversies between them relating to the transaction under
which the fund was placed in escrow. [302]

Under an agreement by the seller of all the capital stock of a business
corporation to indemnify it "against all . . . [its] liabilities" exclusive
of those reflected in a certain balance sheet and of income tax liability
for periods subsequent to its 1956 fiscal year, a breach of the agreement
causing damage to the corporation was not established where, although
an understatement of the value of its closing inventory for its 1956
fiscal year brought about an upward adjustment of that value by tax
authorities and a consequent substantial increase in the corporation's
1956 income tax liability over that reflected in the balance sheet, the
carrying over of such adjusted inventory value as the opening inventory
value for the 1957 fiscal year resulted in a reduction of the corporation's
1957 income tax liability equivalent to such increase in its 1956 income
tax liability. [302–305]

Evidence in a suit in equity warranted a conclusion that an amount indi-
cated as "Reserve for Other Liabilities" in the balance sheet of a busi-

ness corporation attached to an agreement for sale of all its stock and presenting its "net worth" was designed to provide the seller, who agreed to indemnify it "against all . . . [its] liabilities . . . existing on . . . [the date of sale], except those" reflected in the balance sheet, with protection in the amount of the reserve against liabilities not reflected otherwise in the balance sheet, and the trial judge correctly ruled that the seller was entitled to have the amount of the reserve applied as an offset to any liabilities against which he was bound to indemnify. [305–306]

Upon appeals from a final decree in a suit in equity by way of interpleader brought by an escrow agent who paid into court a fund deposited with him by the seller of a business pursuant to an escrow agreement made with the buyer at the time of the sale, this court ordered payment out of the escrow fund of a sum owed by the seller to the buyer under a tax liability agreement, executed after the sale and escrow agreement and connected therewith, as the most convenient method of ensuring complete relief to all the parties. [306]

BILL IN EQUITY, filed in the Superior Court on May 8, 1959. The suit was heard by *Voke*, J.

*George E. Lodgen,* (*Nathan T. Wolk* with him,) for Westland Corporation and another.

*Robert W. Meserve,* (*John K. P. Stone, III,* with him,) for Janigan.

CUTTER, J. This is a bill of interpleader filed in behalf of the partners of a law firm (the escrow agent) to compel the defendants to litigate among themselves their claims to an escrow fund held by the firm. The fund was paid into court. The trial judge made a report of the material facts found by him. A final decree was entered which directed that, after the payment of $840 to the escrow agent, the remainder of the fund be paid to Janigan. Janigan, in turn, was directed to pay to the defendants Westland Corporation (Westland) and Boston Electro Steel Casting, Inc. (New Casting) the sum of $6,689.89 with interest from May 8, 1959. Westland, New Casting, and Janigan appealed. The evidence is reported.

On November 26, 1957, Janigan and Westland executed an agreement (the sale agreement) by which Janigan agreed to sell to Westland, or its nominee, on December 13, 1957, all the outstanding capital stock of Boston Electro Steel Casting, Inc. (referred to, as it existed prior to the stock transfer on December 13, 1957, as "Old Casting"). On December 13, the stock was transferred to Westland's

nominee, Westland Enterprises, Inc., and the purchase price was paid to Janigan. Westland Enterprises, Inc., then liquidated Old Casting to itself and changed its own name to Boston Electro Steel Casting, Inc. (New Casting). Pursuant to the sale agreement Janigan placed $50,000 in the hands of the escrow agent under an escrow agreement. As required by the sale agreement, Janigan also executed an indemnification agreement indemnifying New Casting against certain liabilities.

The sale agreement (par. 2) provided in part that Janigan "hereby . . . warrants that . . . [t]he balance sheet of [Old] Casting as at October 31, 1957, attached hereto . . . fairly presents the financial position of [Old] Casting as at said date and the *net worth* and net quick assets of [Old] Casting as at said date were not less than the respective amounts shown therefor on said balance sheet, except in each case that no provision is made for Federal and State income and excise taxes for periods subsequent to September 30, 1956. [Old] Casting had on October 31, 1957, no contingent liabilities not disclosed or reserved against in said balance sheet"[1] (emphasis supplied). The sale agree-

---

[1] Old Casting's balance sheet as at October 31, 1957, attached to the sale agreement, may be summarized as follows:

| ASSETS | | LIABILITIES | | |
|---|---|---|---|---|
| Quick assets | $637,493.17 | Total liabilities | | $179,042.71 |
| Fixed assets | | Capital stock .. | $222,720.47 | |
| (net) ... | 152,142.04 | Surplus ...... | 387,872.03 | 610,592.50 |
| Total assets | $789,635.21 | | Total of above | $789,635.21 |

Among specific items of liabilities listed were the following:

| | |
|---|---|
| Mortgages and accounts payable ..................... | $146,612.44* |
| "Prov. for Income Tax (down payment on 1957 federal income tax) ..................................... | (10,000.00) |
| "F.I.C.A. ............................................ | 883.18 |
| "State Pay Tax ........................................ | 333.65 |
| "F.U.T.A. ............................................ | 626.66 |
| "Withholding Tax ..................................... | 2,437.90 |
| "Property Tax ........................................ | (868.00)" |
| Miscellaneous other liabilities listed .................. | 9,016.88* |
| "Reserve for Other Liabilities ........................ | 30,000.00 |
| "Total Liabilities ..................................... | [$]179,042.71" |

[*Several subitems are summarized in these items marked with an asterisk.]

One of two footnotes to the balance sheet reads, "No provision has been made for federal, state income and excise taxes other than real estate taxes for periods subsequent to September 30, 1956."

ment (pars. 7, 11) also contained other pertinent provisions which are set out in the margin.[2] Janigan by the indemnification agreement agreed to indemnify Westland and New Casting "against all . . . liabilities . . . of . . . [Old] Casting . . . existing on the date hereof, except those" reflected in the balance sheet (see fn. 1, *supra*), "Federal and State income and excise tax liabilities [of Old Casting], in respect of . . . periods subsequent to September 30, 1956," and certain other matters not here relevant. Under the escrow agreement, the escrow agent was to pay from the fund to the buyer (Westland or New Casting) the amount of any established "secured loss" as defined in par. 5 of the escrow agreement.[3]

Prior to the closing set for December 13, 1957, Westland engaged the accounting firm of Peat, Marwick & Mitchell Co. (Peat, Marwick) to audit the books of Old Casting for the two preceding years. The trial judge found "that they made no report of their audit to any of the parties . . .

---

[2] Paragraph 7 of the sale agreement reads in part, "The obligations of [b]uyer to purchase . . . shall be subject to . . . the performance by [s]eller on or before the closing date of . . . (a) Seller shall indemnify [b]uyer . . . against all . . . liabilities . . . of [Old] Casting, whether known or unknown, contingent or fixed, existing on the date of closing, except those that are either (i) reflected or reserved against in the balance sheet of [Old] Casting attached . . . or . . . (iv) Federal and State income and excise tax liabilities, in respect of operations of [Old] Casting during periods subsequent to September 30, 1956 . . . ."

Paragraph 11 of the sale agreement reads in part, "If . . . before the closing, [b]uyer or his . . . accountants . . . shall ascertain that [Old] Casting has any liability not shown or reserved against on the balance sheet at October 31, 1957, which existed on that date and is not elsewhere disclosed . . . [herein] or if [b]uyer shall ascertain that any other . . . warranty made by [s]eller under this [a]greement is untrue . . . then [b]uyer shall promptly notify [s]eller in writing of such liability [or] untruth . . . . Unless such liability or untruth results from willful action taken by [s]eller after the date of this [a]greement . . . [s]eller shall be under no obligation to cure . . . such liability [or] untruth . . . . Buyer may waive any . . . conditions required to be performed by [s]eller and shall be entitled to demand and receive such rights as [s]eller has in and to the stock of [Old] Casting . . . upon payment of the price . . . and provided also that, if [b]uyer does so waive any condition, the warranties . . . of [s]eller pursuant to" par. 7 (a) of the sale agreement "shall be modified to exclude . . . any liability . . . or warranty . . . which has been so waived by [b]uyer."

[3] Paragraph 5 of the escrow agreement defines "secured loss" as a "loss . . . suffered by [b]uyer or [Old] Casting, including [b]uyer's reasonable attorneys' and accountants' fees . . . incurred in . . . defending such secured loss, and based on facts . . . inconsistent with the . . . warranties . . . made by [s]eller pursuant to" par. 7 of the sale agreement.

until December 14, 1957 — the day after the closing." He also found that the inventory of Old Casting, as of the last day of its fiscal year ended September 30, 1956, "had been understated . . . in the sum of $56,079.76," but that "no party . . . knew the amount of . . . [the] understatement prior to the date of closing."

There was no specific liability for 1956 Federal income tax shown on the balance sheet as of October 31, 1957. At the time of Peat, Marwick's examination of Old Casting's books, there had been imposed no additional Federal or State tax in respect of Old Casting's fiscal year ended September 30, 1956.[4] There was evidence that prior to the closing, Peat, Marwick had reported orally to Westland (a) the alleged $56,079.96 understatement of Old Casting's inventory as at September 30, 1956 (the $56,000 inventory understatement), and (b) an alleged $11,000 overvaluation by Janigan of Old Casting's inventory as at October 31, 1957. Westland's attorney wrote to Janigan about the $11,000 discrepancy. Janigan's attorney testified that Janigan refused to reduce (because of this $11,000 item) either the purchase price or the reserve for " [o]ther [l]iabilities" shown on the balance sheet (see fn. 1, supra). Despite this refusal, the transaction was closed without adjustment based upon the $11,000 item. A representative of Peat, Marwick testified that the $56,000 inventory understatement had been called orally to the attention of the treasurer of Westland, on December 9, 1957, before the closing. The treasurer admitted that about two days prior to December 13 he had been informed by Peat, Marwick that there appeared to be such an understatement on Old Casting's tax return for the year ending September 30, 1956. The presi-

---

4 Paragraph 2 of the sale agreement provided in part that "[s]eller . . . warrants that . . . (f) . . . The Federal income tax return of [Old] Casting has been examined by the Internal Revenue Service for the fiscal year ended September 30, 1956, but the official report . . . [thereon] has not yet been received . . . . On the basis of preliminary information . . . the results of such examination are properly reflected in the balance sheet attached . . . and there is no liability for Federal or State income taxes for periods prior to September, 1956. No provision is made in said balance sheet for Federal and State income or excise taxes for periods subsequent to September 30, 1956."

dent of Westland also conceded that by December 13 he had received word of the understatement. Westland's counsel conceded that, before the closing, no notice of the $56,000 inventory understatement was given to Janigan.

After the closing, the United States tax authorities asserted a claim against Old Casting for a 1956 income tax deficiency amounting to about $28,113.71, plus interest and penalties. This deficiency was based mainly on the alleged understatement of Old Casting's 1956 closing inventory. The additional Federal assessment resulted in a claim against Old Casting by Massachusetts for an additional excise of $3,943.31, plus interest.

On February 5, 1958, a further agreement (the 1956 tax agreement) was executed by Westland, New Casting, Janigan, and the escrow agent. Under this agreement New Casting agreed to admit the existence of the principal amount of the 1956 Federal tax deficiency ($28,113.71) and to consent to a 5% negligence penalty. It was also agreed that the principal amount was "a proper liability of Old Casting as at September 30, 1956." New Casting paid this principal amount. Janigan paid an aggregate of $3,566.27, the interest on the tax ($2,065.01) to November 19, 1958, and the negligence penalty ($1,405.69), plus $95.57 of interest on original tax. Janigan now concedes that he remains bound to pay $3,222.54 for certain Federal penalties and, in addition, interest of $709.80 on the Massachusetts tax. New Casting has paid the additional Massachusetts tax of $3,943.31, plus $709.80 interest thereon.[5]

---

[5] The trial judge found that the items not yet paid by Janigan which New Casting seeks to obtain from the escrow fund are:

| | | |
|---|---|---|
| "[1] | Federal deficiency tax | $28,113.71 |
| [2] | Federal penalty and negligence tax | 1,405.69 |
| [3] | Additional Federal penalty tax | 1,816.85 |
| [4] | Commonwealth of Massachusetts additional 1956 excise tax | 337.18 |
| [5] | Massachusetts unpaid excise tax for fiscal year 1955 | 363.35 |
| [6] | Additional Massachusetts excise tax for fiscal year 1956 | 3,943.31 |
| [7] | Plus interest thereon | 709.80 |
| [8] | The total of these figures is | $36,689.89." |

Janigan concedes that he must pay items 2, 3, and 7, above.

The trial judge also found that Janigan in Old Casting's balance sheet reserved for "other liabilities" the sum of $30,000. He ruled that this "sum [must] be applied in reduction of . . . [the] sum of $36,689.89 [see fn. 5, *supra*], leaving a balance of $6,689.89 due from Janigan to Westland" and New Casting "as reimbursement." He found that Janigan owed them "$6,689.89, together with interest . . . from May 8, 1959, the date of the filing of the [b]ill."

1. Janigan and Westland and New Casting request that all the controversies between them be disposed of in this litigation. A leading authority on interpleader has presented persuasive support for "the power of an equity court to admit an additional controversy into the second stage of an interpleader . . . where the court, in its discretion, thinks that such a union would accomplish justice." Chafee, Broadening the Second Stage of Interpleader, 56 Harv. L. Rev. 541, 562.[6] Settlement in this litigation of all the controversies presented, as the parties desire, is consistent with usual equitable principles and will afford the parties complete relief. See *Glazer* v. *Schwartz,* 276 Mass. 54, 58; *Greeley* v. *Flynn,* 310 Mass. 23, 28. See also *Atlantic Natl. Bank* v. *Hupp Motor Car Corp.* 300 Mass. 196, 202–203; *McDade* v. *Moynihan,* 330 Mass. 437, 443–445; *Piea Realty Co. Inc.* v. *Papuzynski,* 342 Mass. 240, 250.

2. We assume (without deciding)[7] that New Casting,

---

[6] See *American Sur. Co.* v. *Calcasieu Oil Co.* 3 F. Supp. 939, 940–941 (W. D. La.); *Provident Sav. & Loan Assn.* v. *Booth,* 138 Neb. 424, 430; *State Bank* v. *Wilbur Mission Church,* 44 Wash. 2d 80, 94; Pomeroy, Equity Jurisprudence (5th ed.) §§ 231, 1320, 1324. See also *Glass* v. *Olsson,* 315 Mass. 24, 25. Cf. *Consolidated Underwriters of S. C. Ins. Co.* v. *Bradshaw,* 136 F. Supp. 395, 397–398 (W. D. Ark.); *Catts* v. *Sipsey Coal Mining Co.* 212 Ala. 421, 423; *Northern Trust Co.* v. *McDowall,* 307 Ill. App. 29, 33–34; *Kauffman* v. *Phillips,* 154 Iowa 542, 548–549. Cf. also cases arising under special statutory provisions, *Barnett* v. *Riceman,* 294 Mass. 148, 151–152; *McGee* v. *Springfield Inst. for Sav.* 294 Mass. 212, 213. For a discussion of certain aspects of interpleader, see *Gonia* v. *O'Brion,* 223 Mass. 177, 178–179; *Savage* v. *McCauley,* 301 Mass. 162, 164–166.

[7] Because of the result which we reach in this case, we need not consider Janigan's contentions (1) that the trial judge was plainly wrong in finding that no party knew the amount of the $56,000 inventory understatement until after December 13, 1957; (2) that the testimony of Westland's president and treasurer established that prior to the closing they had knowledge of the alleged understatement and thus did not rely upon it; (3) that their knowledge, and testimony about it, are binding upon Westland (see *Bockser* v. *Dorchester Mut.*

Westland's subsidiary (claiming as Westland's nominee), may proceed against Janigan under the indemnification agreement by which Janigan at the time of the closing undertook to hold New Casting harmless "against all . . . liabilities . . . of . . . [Old Casting] existing on . . . [December 13, 1957] except those . . . [r]eflected or reserved against in the balance sheet of [Old] Casting" as of October 31, 1957 (see fn. 1, *supra*), and except certain other items not here pertinent. Even upon this assumption (that Janigan may be liable under the indemnification agreement notwithstanding Janigan's contentions mentioned earlier, see fn. 7), we hold that Westland and New Casting have not established any breach of the indemnification agreement causing damage to Westland or New Casting above the amount of the $30,000 reserve for "[o]ther [l]iabilities" shown on Old Casting's balance sheet of October 31, 1957.

Of the principal amount ($28,113.71) of the 1956 deficiency tax, more than 90% was based upon a $56,079.76 upward adjustment of Old Casting's 1956 closing inventory. Old Casting's Federal income tax for its fiscal year ending September 30, 1957, was necessarily reduced by reason of the increase in the closing inventory as of September 30, 1956, which, of course, caused a like increase in Old Casting's opening 1957 inventory. See *Albino* v. *Commissioner of Internal Revenue,* 273 F. 2d 450, 451 (2d Cir.). By the upward adjustment of the inventory as at September 30, 1956, the cost of goods sold in 1956 was reduced, and the cost of goods sold in 1957 was increased. See *Carmichael Tile Co.* v. *Commissioner of Internal Revenue,* 192 F. 2d 209, 210 (5th Cir.) ; Amory and Hardee, Materials on Accounting (3d ed. Herwitz and Trautman) pp. 33–36. Old Casting had sufficient net income to make it subject to a 52% Federal income tax rate in each of its fiscal years ending in 1956 and 1957. Apart from the relatively minor ef-

---

*Fire Ins. Co.* 327 Mass. 473, 477–478. See also *Hannon* v. *Hayes-Bickford Lunch Sys. Inc.* 336 Mass. 268, 273; Restatement 2d: Agency, §§ 10, 268; Wigmore, Evidence [3d ed.] § 2594a; McCormick, Evidence, § 243) ; and (4) that, by failing to give notice to Janigan of the alleged understatement (pursuant to par. 11 of the sale agreement, see fn. 2, *supra*), Westland waived any resulting breach of warranty.

Cochrane *v.* Janigan.

fect of other adjustments, Old Casting's 1957 Federal income tax liability was reduced (as a consequence of the inventory reappraisal) by the same amount by which its 1956 tax liability was increased. See Mertens, Federal Income Taxation (Zimet and Stanley Rev.) § 16.01 et seq. See also Hartley, 23 T. C. 353, 357; 26 C. F. R. (1961) § 1.446–1 (a) (4) (i). To the extent that Old Casting's inventory value as of September 30 and October 1, 1956, was increased, there would inevitably be a reduction of Old Casting's 1957 tax liability. This liability, of course, New Casting would have to pay.

New Casting thus has not established that any breach of the indemnification agreement with respect to most of the 1956 tax deficiency has caused it damage, for the very adjustment which gave rise to the 1956 liability gave rise to a substantially comparable benefit in 1957.[8] Janigan, at most, is liable for the actual loss which any breach of his agreement has caused. See *Valentine* v. *Wheeler,* 122 Mass. 566, 568–570; *Victor* v. *Levine,* 267 Mass. 442, 444; *Maxwell Underwriters, Inc.* v. *Zimmerman,* 301 Mich. 485, 488–489; 27 Am. Jur., Indemnity, § 26. See also *Magnolia Metal Co.* v. *Gale,* 189 Mass. 124, 132–133; *Ficara* v. *Belleau,* 331 Mass. 80, 82; *Wicker* v. *Hoppock,* 6 Wall. 94, 99; *In re H. L. Herbert & Co.* 262 Fed. 682, 684 (2d Cir.); *Tessier* v. *United States,* 164 F. Supp. 779, 780 (D. Mass.), affd. 269 F. 2d 305 (1st Cir.); Corbin, Contracts, § 1038; McCormick, Damages, §§ 40, 41. Cf. *Cormier* v. *Hudson,* 284 Mass. 231, 238; *Leshefsky* v. *American Employers' Ins. Co.* 293 Mass. 164, 170; *F. A. Bartlett Tree Expert Co.* v. *Hartney,* 308 Mass. 407, 411–413.

We recognize that the escrow agreement expressly gives to Janigan the benefit of any tax saving or benefit to Westland or New Casting arising out of the payment by Janigan of any loss secured under the escrow agreement. The

---

[8] Janigan, of course, has already paid, or provided for the payment of, certain of the items connected with the 1956 deficiency tax which did not give rise to any reduction in 1957 tax liability, viz., the interest and negligence penalty.

absence of such a provision in the indemnification agreement does not mean that Janigan, if liable under the indemnification agreement, cannot have the benefit of any tax saving to New Casting growing out of the same facts which give rise to any liability of Janigan under the indemnification agreement.  To the extent that the facts giving rise to the 1956 deficiency tax liability also necessarily furnish to New Casting a substantially corresponding 1957 tax reduction, loss to New Casting does not occur or is reduced.

3.  The trial judge correctly ruled that Janigan was entitled to have the $30,000 reserve for "[o]ther [l]iabilities" applied as an offset to any liabilities against which he was bound to indemnify New Casting.  The testimony indicates that the $30,000 reserve was "a protection the attorneys had put in there."  It was to be "an additional cushion to cover loose ends, inasmuch as the balance sheet . . . was $30,000 better than what the parties had bargained for in their formal talks initially."  That Janigan refused to reduce either the $30,000 reserve or the purchase price because of the alleged $11,000 overvaluation of inventory (as of October 31, 1957) may have some tendency to confirm the evidence, mentioned above, that the $30,000 reserve was designed to provide Janigan with that much protection against liabilities not reflected otherwise in the balance sheet of October 31, 1957.  Similar confirmation is given by the circumstance that Janigan's principal warranty in par. 2 of the sale agreement was that Old Casting's "net worth" was that shown on the balance sheet.

In any individual case, the purpose of such a general reserve may be somewhat ambiguous.  If not required for contingent or uncertain liabilities, it eventually will become fully recognized as a part of surplus.  See Hills, Law of Accounting and Financial Statements, § 4.1; Kester, Accounting, vol. 3, pp. 41–42; Finney and Oldberg, Lawyer's Guide to Accounting, p. 171; Shugerman, Accounting for Lawyers, p. 328.  Preferable modern accounting practice perhaps would lead to use of some term other than "reserve" for this type of provision, or to a more specific

statement of the particular classes of liabilities necessitating the item. See American Institute of Accountants, Accounting Terminology Bulletin, No. 1, pars. 57–64 (reprinted in Amory and Hardee, Materials on Accounting [3d ed.] pp. 453, 466–468). See also 17 C. F. R. (1962) § 210.3–19. Nevertheless, these authorities (although deploring imprecise use of the term ''reserve'' and ambiguous general allocations of retained income to somewhat nebulous possible liabilities) recognize that businessmen do set up such general protective balance sheet items, usually in an effort to state company financial positions conservatively. Whatever may be the most approved modern accounting practice, we think that the evidence about the origin of this reserve, and the conduct of the parties with respect to it, amply justified the trial judge in construing the $30,000 reserve as he did. Accordingly, Janigan will not become liable to reimburse New Casting for liabilities (a) which not only were within his indemnification agreement, because not specifically reflected in the balance sheet of October 31, 1957, but (b) which also actually have caused damage to New Casting, until those liabilities in the aggregate have exceeded $30,000.

4. To the extent that loss was caused to New Casting by the increase in Old Casting's 1956 Federal and State tax liability, interest, and penalties, that loss either has been paid already by Janigan or is very much less than the amount of the $30,000 reserve. Janigan thus is bound to pay to New Casting only the items which he concedes that he owes because of the 1956 tax liability agreement, an aggregate amount of $3,932.34. It thus is not necessary for us to make analysis of the escrow agreement in order to ascertain whether these items (if they had exceeded the amount of the $30,000 reserve) would have been ''secured'' claims or losses under that agreement (see fn. 3, *supra*). The provisions of the escrow agreement and the 1956 tax agreement reasonably permit payment of these items to New Casting out of the fund. Such a payment is the most convenient method of ensuring complete relief.

5.   Paragraphs 2 and 3 of the final decree are to be re-
placed by new paragraphs providing (a) that the clerk of
court is to pay to New Casting out of the escrow fund the
sum of $3,932.34, together with interest thereon from May 8,
1959, and (b) that, after the payments otherwise required
to be made from the escrow fund by the decree as modified,
the remainder of the escrow fund is to be paid to Janigan.
As so modified, the final decree is affirmed.   Janigan is to
pay one half the expense of printing the record upon this
appeal.   Westland and New Casting are to pay the other
half of the expense of printing the record.

                                                   *So ordered.*