VINCENT FILIPPONE & others vs. MAYOR OF NEWTON
& others.

Middlesex. April 14, 1983. — July 28, 1983.

Present: GREANEY, CUTTER, & PERRETTA, JJ.

*Indemnity. Public Employment,* Indemnification of employee. *Constitutional Law,* Home rule. *Municipal Corporations,* By-laws and ordinances.

General Laws c. 258, § 9, was intended by the Legislature as a comprehensive treatment of the subject of indemnification of public employees by their employers and was designed to preclude any inconsistent exercise of municipal power on the same subject, so that, to be a permissible exercise of home rule, provisions of an ordinance of the city of Newton requiring the city to pay charges of outside legal counsel in certain actions against city officials were to be construed in conformity with § 9. [420-428]

A city solicitor's determination that a conflict of interest existed which would prevent him from defending the mayor of the city in a civil rights action was not to be set aside in the absence of clear error or abuse of discretion. [428-429]

Discussion of the issues to be considered by a judge on remand in reviewing a city solicitor's determination that a conflict of interest would prevent him from representing the city's mayor in a civil rights proceeding. [429-431]

A mayor's dismissal of his secretary was an action "within the scope of his official duties or employment" so as to come within the terms of a city ordinance providing for indemnification of certain officials. [431-432]

CIVIL ACTION commenced in the Superior Court Department on December 23, 1981.

The case was heard by *James P. Donohue,* J.

*Arthur H. Goldsmith* for the plaintiffs.

*Edward J. Barshak* (*Daniel M. Funk,* City Solicitor, *Helaine E. Honig,* Assistant City Solicitor, *Natasha C. Lisman & Judy Meyers* with him) for the defendants.

GREANEY, J.  The plaintiffs, taxpayers of the city of Newton, commenced this action in the Superior Court, seeking to enjoin and declare invalid an appropriation of $10,000 by the Newton board of aldermen (board) to pay Mr. Edward J. Barshak, an attorney, for legal services. The services were rendered by Mr. Barshak in defense of a civil suit presently pending against Theodore D. Mann, the mayor of Newton.  The taxpayers' action named the mayor, the city, Mr. Barshak, several city officials and the board as defendants, alleged that the appropriation was improper on several grounds, and asserted a violation of the open meeting law, G. L. c. 39, § 23B.  On cross motions for summary judgment, a judge of the Superior Court, in a detailed memorandum of decision, dismissed the count of the complaint alleging a violation of the open meeting law on the ground that the complaint was not timely filed as to that claim; held the subject appropriation invalid for lack of any evidence that the expenses had in fact been incurred; and declared that "upon proper receipt of a bill for services rendered by Edward Barshak, the Mayor of Newton and Board of Aldermen shall approve payment unless the fees are found to be unreasonable." Judgment entered, and the plaintiffs perfected this appeal.  We reverse the judgment.

The pertinent facts are not in dispute.  On March 7, 1980, the mayor fired his secretary, Diana Ossinger. Criminal complaints issued on that same day, charging Ossinger with forty-four counts of larceny, all stemming from the cashing of paychecks by Ossinger for the mayor over a period of several years.  Ossinger was acquitted on all the charges later in 1980.  She thereafter made a written demand for reinstatement to her job, back wages and benefits. Failing to obtain relief, Ossinger commenced an action against the mayor and the city on June 11, 1981, seeking damages and reinstatement, alleging that her termination was accomplished in a manner which denied her procedural due process of law.  In March of 1981, in the interim between Ossinger's written demand and the filing of her lawsuit, the board adopted, and the mayor approved, Newton

ordinance No. R-129,[1] providing for the indemnification and legal defense of certain municipal officers, including the mayor, in civil rights actions.

The mayor was initially represented in the Ossinger litigation by the Newton city solicitor. The city was removed from the lawsuit in July, 1981, when its motion to dismiss was allowed. This left the mayor as the sole defendant. On August 11, 1981, the city solicitor withdrew his appearance, and Mr. Barshak appeared for the mayor in the case. The city solicitor sought an appropriation of $10,000 to cover Mr. Barshak's legal fees. An assistant city solicitor appeared before the board's finance committee on November 23, 1981, in support of that request. The committee went into executive session at the assistant city solicitor's suggestion after she represented to the committee that the appropria-

---

[1] The operative sections of the ordinance read as follows:

"Indemnification of Certain Officers.

"The City shall indemnify and save harmless members of the School Committee and the Board of Aldermen, the Mayor, the Superintendent of Schools and the Department Heads from personal financial loss and expenses, including costs, if any, in an amount not to exceed one million dollars arising out of any claim, action, award, compromise, settlement or judgment by reason of any act or omission which constitutes a violation of the civil rights of any person under any federal or state law; if such [officer] at the time of such act or omission was acting within the scope of his official duties or employment; provided, however, that such [officer] shall provide reasonable cooperation to the City in the negotiation, investigation and defense of any claim or action brought as a result of such act or omission. No such [officer] shall be indemnified under this section for violation of any civil rights if he or she acted intentionally or in a grossly negligent, willful or malicious manner.

"The defense and/or settlement of any such claim shall be undertaken or negotiated by the City Solicitor, his agent or designee. However, in the event that the City Solicitor determines that a conflict of interest has arisen or is likely to arise by his mutual defense of the City of Newton and the officer(s) in question, the officer(s) in question shall not be defended by the City Solicitor, his agent or designee but shall seek outside counsel for such defense. The expense incurred by the employee for outside counsel shall be borne by the City unless the Mayor and the Board of Aldermen shall deem said legal fees to be unreasonable in which event said legal fees shall be subject to the fee arbitration procedure of the Massachusetts Bar Association."

tion was necessary because of a conflict of interest on the part of the city solicitor and that explanation of the conflict would reveal litigation strategy. After meeting in executive session for about fifteen minutes (these private deliberations constituting the basis for the open meeting law claim ultimately dismissed by the judge) the committee reconvened in open session, held further discussions, and voted in favor of the appropriation. The appropriation was subsequently approved by the full board. The present action was commenced after the board rejected a motion to reconsider its vote.

After judgment entered in the Superior Court invalidating the appropriation and directing the payment of future bills if reasonable, Mr. Barshak submitted an itemized bill for legal services rendered in both the Ossinger litigation and this action in the amount of $13,624.29. The bill was presented to the board by the mayor for approval of payment pursuant to the judgment and the ordinance. A single justice of this court stayed the provision of the judgment ordering payment upon receipt of a bill for Mr. Barshak's services and enjoined the mayor and Mr. Barshak from receiving money from the Newton treasury on account of the bill pending disposition of this appeal.

1. In the Superior Court, the plaintiffs sought, among other relief, a declaration concerning "the entitlement of Mayor Mann to be indemnified under G. L. c. 258, § 9, and Ordinance No. R-129." With respect to the ordinance, the plaintiffs' arguments below focused on whether the city solicitor had a conflict of interest and whether the mayor's action in terminating Ossinger fell within the scope of his employment or was of a character which would preclude indemnification under the ordinance. The judge rejected the plaintiffs' arguments on the scope of employment and conflict issues. He ruled that the second paragraph of ordinance No. R-129 was intended to provide covered officials with a free defense in civil rights cases, either by the city solicitor or by private counsel, without regard to whether those officials would qualify for indemnification under the

provisions in the first paragraph of the ordinance dealing with judgments and settlements. As we will explain, the judgment, in effect, approved a plan for the payment of fees for certain legal services which differs from provisions for such payments contained in G. L. c. 258, §§ 9 and 13. These two statutes deal in some detail with the subject of indemnification of public employees and were used as a model for the ordinance. The difference between these statutes and the ordinance raises an important question of law as to the validity of the local provision under principles of home rule. Because of the public interest involved and the uncertainty which would likely result if the question is left unresolved, and to avoid an unjust result, we think the case presents the uncommon situation where an issue first briefed and argued on appeal, and neither raised nor passed upon below, should be decided. See *McLeod's Case*, 389 Mass. 431, 434 (1983). Cf. *Wellesley College* v. *Attorney Gen.*, 313 Mass. 722, 731 (1943).

General Laws c. 258, § 9,[2] permits public employers to indemnify public employees acting within the scope of their official duties or employment "from personal financial loss and expenses, including legal fees and costs" arising out of intentional torts or civil rights violations.[3] Indemnification

---

[2] The relevant paragraph of § 9 (as inserted by St. 1978, c. 512, § 15) reads as follows: "Public employers may indemnify public employees from personal financial loss and expenses, including legal fees and costs, if any, in an amount not to exceed one million dollars arising out of any claim, action, award, compromise, settlement or judgment by reason of an intentional tort, or by reason of any act or omission which constitutes a violation of the civil rights of any person under any federal or state law; if such employee or official at the time of such intentional tort or such act or omission was acting within the scope of his official duties or employment. No such employee or official shall be indemnified under this section for violation of any such civil rights if he acted in a grossly negligent, willful or malicious manner."

[3] We shall assume, because the parties do, that Ossinger's action involves a "violation of . . . civil rights . . . under . . . federal or state law" within the meaning of that language in both § 9 and the ordinance, despite the fact that her complaint does not expressly allege a civil rights violation, as such, and is not denominated as an action brought pursuant to 42 U.S.C. § 1983 (1976 & Supp. 1979) or G. L. c. 12, § 11I.

under § 9 is prohibited, however, in civil rights cases if the employee "acted in a grossly negligent, willful or malicious manner." General Laws c. 258, § 13, provides for mandatory indemnification of municipal officials on terms virtually identical to those of § 9, in cities and towns which have accepted either § 13 or a predecessor statute (the former G. L. c. 41, § 100I, inserted by St. 1975, c. 753, § 3). Newton accepted neither § 13 nor G. L. c. 41, § 100I. Accordingly, we confine our discussion of the validity of the ordinance under home rule powers to the interplay between § 9 and the ordinance.

There are several differences between § 9 and the ordinance. First, § 9 contemplates an indemnity from "financial loss and expenses," expressly including "legal fees" within the concept of loss and expense.[4] Apart from this indemnity, the statute contains no provision for the payment of legal fees. The statute also expressly forbids indemnification in any civil rights case involving grossly negligent, wilful or malicious conduct. As the judge observed, the determination whether this exception to indemnification applies "cannot be made until the verdict is rendered in the Ossinger case." We note that a general verdict for the plaintiff in that case might leave the issue in doubt (as would a settlement). In any event, it appears that the mayor's entitlement to indemnification under § 9 cannot be determined until several pending questions in the Ossinger case are decided.[5] The ordinance, however, as interpreted

---

[4] We attach no significance to the presence in the ordinance and § 13 (or the absence in § 9) of the requirement, in addition to indemnity, that the official be "save[d] harmless." "Save harmless" clauses and "indemnity" clauses have commonly been construed as conferring identical rights. See *New York, N.H. & H. R.R.* v. *Water Commrs. of Hartford,* 102 Conn. 488, 498 (1925); *Diamant* v. *Chestnut,* 204 Mich. 237, 243 (1918); *Lee* v. *Providence Washington Ins. Co.,* 82 Mont. 264, 276 (1928); *Massimilian* v. *Board of Educ. of Niagara Falls,* 261 A.D. 428, 430-431 (N.Y. 1941).

[5] In the event that indemnification was denied or was challenged after a civil rights suit went to judgment on a general verdict or was settled without resolution of the factors which would implicate the exception to indemnity, those issues would likely have to be resolved in an appropriate action brought by the potential indemnitee or the challengers. See generally *Karas* v. *Snell,* 11 Ill. 2d 233, 244-245 (1957) (discussion of problem of determining applicability of statutory exception to indemnity in cases

by the judge, allows payment of attorney fees prior to any decision on the exception's applicability and without any provision for recovery of monies paid in cases where it is determined that the exception applies. Indeed, as construed, the ordinance confers the right to payment of attorney fees even on those who are not eligible for indemnification for judgments or settlements because of the exception.

Second, § 9 allows indemnification from *"loss* and *expenses"* (emphasis supplied), as distinguished from indemnification from liability. There is, in the law of other jurisdictions, a clear, pervasive and well-established distinction between obligations of indemnity "from loss" and "from liability." Under this distinction, the rights of an indemnitee "from loss" mature only when he has sustained a loss by actual payment, whereas an indemnitee "from liability" has a right to indemnification when that liability becomes fixed and established, without regard to whether an actual loss through payment has occurred.[6] See *Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A.G.,* 3 Cal. 3d 434, 446 (1970); *Moberly* v. *Leonard,* 339 Mo. 791, 800 (1936); *North* v. *Joseph W. North & Son,* 93 N.J.L. 438, 441 (1919); *Potter* v. *Wilson,* 609 P.2d 1278, 1280 (Okla. 1980); *National Sur. Corp.* v. *First Natl. Bank,* 424 S.W.2d 27, 29 (Tex. Civ. App.), rev'd on other grounds, 431 S.W.2d 353 (Tex. 1968); *Mullins* v. *Elieson,* 611 S.W.2d 921, 925 (Tex. Civ. App. 1981); 41 Am. Jur. 2d, Indemnity §§ 29 & 31 (1968).

While Massachusetts law on the subject is sparse, it reflects the prevailing view. In *Victor* v. *Levine,* 267 Mass. 442 (1929), the plaintiff alleged that he was surety upon a bail bond for one Harris and that the defendant had agreed

---

of wilful or malicious conduct when trial on primary liability of employee does not reach the issue). When the issues arise early enough, the action might be consolidated with the civil rights case. In light of our resolution of this case, we do not reach the issues raised by the denial of the plaintiffs' motion (assented to by Ossinger) to consolidate this action with the pending civil rights case, noting only that the goal of judicial economy might be furthered by consolidation.

[6] We are unaware of any jurisdiction which has dealt with the issue and has reached a different result.

to indemnify him from "any loss which he may suffer by reason thereof." Harris failed to appear and was defaulted. The plaintiff sued on the indemnification provision, asserting that because of Harris' default a claim had accrued in favor of the Commonwealth against him, upon which demand was about to be made. The Supreme Judicial Court held, in upholding the allowance of a demurrer, that the plaintiff had failed to state a case because there was no allegation in the bill that any loss had been suffered or that the obligation to indemnify had yet arisen. *Id.* at 444. See also *Valentine* v. *Wheeler*, 122 Mass. 566 (1877);[7] *Cochrane* v. *Janigan*, 344 Mass. 296, 304 (1962). In *Cormier* v. *Hudson*, 284 Mass. 231 (1933), the court held that an insurance policy indemnifying the insured "[a]gainst loss from . . . liability imposed by law" did not require the insured to pay a judgment as a prerequisite to indemnification under the policy. The holding, however, was based upon judicial construction of the insurance policy under G. L. c. 175, § 112, which provides that "satisfaction by the insured of a final judgment for . . . loss or damage shall not be a condition precedent to the right or duty of the company to make payment on account of said loss or damage" under motor vehicle liability policies. The case was therefore "not governed on this point by *Valentine* v. *Wheeler*, [supra], and *Victor* v. *Levine*, [supra]," but by the principles of construction applied to a similar insurance policy and governing statute in *Lorando* v. *Gethro*, 228 Mass. 181, 184-185, 189 (1917).[8] *Cormier* v. *Hudson*, *supra* at 238.[9]

---

[7] In the *Valentine* case, the court held that under a "bond of indemnity against losss . . . , the plaintiff is only to recover the actual amount of the loss." 122 Mass. at 568, the claim being one "for reimbursement only." *Id.* at 570.

[8] The opinions in the *Lorando*, *Victor* and *Cormier* cases were all by Chief Justice Rugg. The reference to the *Victor* decision (and its precursor, *Valentine*) in the *Cormier* case appears to have been intended to forestall any attempt to read the later opinion as vitiating the rule announced in the earlier cases. Emphasis was placed on the clear and express statutory prohibition against casualty insurance policies being written to require payment to be made in the first instance by the insured. *Cormier* v. *Hudson*, *supra* at 238-239.

[9] No reason not to apply the rule stated in the *Valentine* and *Victor* cases yet presents itself here. Situations, however, could be envisioned where a

Finally, there may be a distinction between the statute and the ordinance which may suggest why actual payment of losses and expenses is a prerequisite to indemnification. Section 9 authorizes indemnity from "*personal* loss and expenses" (emphasis supplied). This may indicate that the obligation to indemnify extends only to the net personal losses of covered individuals, after the proceeds of any private liability insurance which they may carry have been deducted, and with no right of subrogation afforded to the private insurer. See *Sun Indem. Co.* v. *Board of Educ. of N.Y.,* 264 A.D. 73, 74-75 (N.Y. 1942) (indemnification of teacher by school board inures only to benefit of teacher, not to insurer which paid judgment). See also *A. & B. Auto Stores of Jones Street, Inc.* v. *Newark,* 59 N.J. 5, 23-28 (1971) (public indemnity for riot damage); *Horace Mann Ins. Co.* v. *Wauwatosa Bd. of Educ.,* 88 Wis. 2d 385, 390-394 (1979) (indemnity of teacher by school board limited by statute to amount in excess of insurance). But see *Bridewell* v. *Board of Educ. of Shawnee,* 2 Ill. App. 3d 684, 690-691 (1971); *St. Paul Ins. Cos.* v. *Horace Mann Ins. Co.,* 231 N.W.2d 619, 624-625 (Iowa 1975). We have taken note of the fact that "an important purpose of statutes such as G. L. c. 269, § 8 [providing for public indemnity for riot damage], is to provide redress of injuries for which other forms of compensation may be unavailable." *Abraham* v. *Woburn,* 10 Mass. App. Ct. 416, 423 (1980), rev'd on other grounds, 383 Mass. 724 (1981).

There are several reasons why private liability insurance may cover losses which might otherwise be indemnified under § 9. That statute covers the broad spectrum of public employees but is permissive, not mandatory, in operation. Recognizing that indemnification may not be available to all eligible employees, unions and professional

---

clear right to indemnification exists and actual payment by the indemnitee would be so onerous that relief from the actual payment requirement should be provided on equitable principles. In the usual case, it is to be expected that the requirement will not be compelled. The ordinary situation should lead the indemnitor to pay without forcing the indemnitee to go through the ritual of borrowing and tendering the money, if the other requirements for indemnification have been met.

associations may provide insurance to their members generally, which, in effect, would duplicate coverage where provision has been made for indemnification out of public funds. Furthermore, the indemnification provided by a public employer under § 9 may be neither absolute (because of the exception for grossly negligent, wilful or malicious civil rights violations) nor limitless (because of the one-million dollar cap on indemnity). These limitations may make private insurance attractive to individual employees.[10] The ordinance, as construed by the judge, does not address the likelihood that private insurance may exist which would protect an employee from sustaining a truly "personal" loss or expense. As it stands after the judge's decision, the ordinance permits payment for private counsel even where that counsel is provided or initially paid for by an insurer at no cost to the employee, in effect bestowing a benefit on the insurance company.

2. Having identified these differences between the treatment of attorney fees under the statute and under the ordinance, we reach the question whether the ordinance, as construed, is a permissible exercise of home rule. We hold that it is not.

"Under § 6 of art. 89, the Home Rule Amendment [to the Massachusetts Constitution, and § 13 of G. L. c. 43B, the Home Rule Procedures Act, communities may enact legislation to advance the common good so long as it is not inconsistent with State law." *Marshfield Family Skateland, Inc.* v. *Marshfield,* 389 Mass. 436, 440 (1983). "Local regulations enjoy a presumption of validity, and a sharp conflict between the local and State legislation is required before the local regulation will be held invalid." *School Comm. of*

---

[10] Since we reach the conclusion here that, as under the statute considered in *Horace Mann Ins. Co.* v. *Wauwatosa Bd. of Educ., supra,* "the governmental unit has the option of either providing counsel itself or refusing to do so and reimbursing the employee by paying reasonable attorney's fees and costs of defense at the end of litigation if the employee qualifies for reimbursement under the statute," *id.* at 393, it follows that employees may wish to purchase insurance "to have their defense undertaken and paid for from the outset by the insurer." *Ibid.*

*Boston* v. *Boston,* 383 Mass. 693, 701 (1981). The question is whether, under the standards traditionally employed in Federal preemption cases and Massachusetts decisions dealing with "inconsistent" or "repugnant" local enactments, a legislative intent to preclude local action can be discerned. *Bloom* v. *Worcester,* 363 Mass. 136, 155 (1973). Such an intent can be found from a comprehensive treatment of a subject by the Legislature bespeaking a purpose which could not "be achieved in the face of the local [ordinance]." *Grace* v. *Brookline,* 379 Mass. 43, 54 (1979). See *Bloom* v. *Worcester, supra* at 156.

The mere existence of legislation on a subject does not, of course, necessarily preclude the enactment of local ordinances on the same subject. *Ibid.* We believe, however, that G. L. c. 258, § 9 (and the substantially identical G. L. c. 258, § 13), are specific in their terms and were intended by the Legislature to confine (on grounds of public policy) indemnification of public employees by their employers to covered cases where (1) there is a loss or actual expense which is (2) personal to the employee, (3) not occasioned (in civil rights cases) by grossly negligent, wilful or malicious conduct, and (4) in any event, limited to a maximum indemnification of $1,000,000. By these restrictions, the Legislature apparently sought to limit the ability of public employers to expose the taxpayers to potentially sizeable financial obligations arising out of intentional torts and civil rights violations committed by public employees. This purpose would be frustrated by the simultaneous existence of local enactments permitting considerably broader rights of indemnification than those contemplated by the statutes. We therefore view the statutes as a comprehensive treatment of the subject of indemnification in this area and as designed "to preclude the exercise of any [inconsistent] local power or function on the same subject." *Bloom* v. *Worcester, supra* at 155. The Legislature, of course, may choose to exercise its prerogative to change the statutes to expand the scope of indemnification. As things stand now, however, we conclude that the portion of ordinance No. R-129 calling

for the city to pay charges of outside counsel must be construed, in conformance with § 9, as allowing payment of such charges only where there has been a determination of actual expense by a covered official which is not recompensable through private insurance and which does not fall within the exceptions contained in § 9 and the first paragraph of the ordinance.[11]

3. The ordinance provides for representation in cases like this by the city solicitor, with the proviso that "in the event that the City Solicitor determines that a conflict of interest has arisen or is likely to arise by his mutual defense of the City of Newton and the officer(s) in question, the officer(s) in question shall not be defended by the City Solicitor, his agent or designee but shall seek outside counsel for such defense," the expense to be "borne by the City." The plaintiffs argue that no conflict of interest exists which would permit retention of outside counsel and payment of his fees under the ordinance. The judge ruled that the city solicitor's determination that he had such a conflict could not be set aside unless "clearly wrong or an abuse of discretion" and that the determination in this instance was neither because "[t]he City of Newton remains a named party on appeal in the Ossinger suit, the Mayor himself could have a cause of action against the City, and the City Solicitor could be called as a witness." The defendants argue that the question of the existence of a conflict lies within the unfettered discretion of the city solicitor and is not open to challenge in a taxpayers' action under G. L.

---

[11] We have reviewed the legislative history of §§ 9 and 13 and have found nothing inconsistent with the foregoing analysis, nor have we been directed by the parties to any such material.

We further note our view that there is no conflict between § 9 and the ordinance in so far as the ordinance provides for representation in most cases by the city solicitor. While § 9 deals with legal expenses of covered public employees, it neither requires nor prohibits the provision of a defense through the city's legal department. Where the defense is undertaken by city personnel, the employee never incurs indemnifiable expense for defense services. Such a measure furthers a public purpose since the utilization of in-house legal personnel may reduce the city's net outlay for defense work.

c. 40, § 53, because it relates to "the minutiae of the manner in which . . . power is exercised," rather than the "broad question . . . whether the expenditure at issue is within 'the legal and constitutional power' of the municipality." They also rely on the three grounds of conflict enumerated by the judge.

We reject the contention that the city solicitor's opinion that he has a conflict of interest is beyond challenge. Whether considered in the context of a taxpayers' suit, or under the plaintiffs' request for a declaration of rights, the question of the existence of a conflict goes to the heart of the city's authority to pay for outside counsel under the terms of the ordinance. The judge acted properly in addressing the question. We consider the "clear error or abuse of discretion" standard employed by the judge to be the correct one and to embody appropriate deference to the city solicitor's judgment as a matter of discretion.[12]

On the present state of the record, however, we do not agree with the judge's conclusions with respect to the three asserted areas of conflict. The city had been dismissed as a defendant in the Ossinger case by the time Mr. Barshak undertook to represent the mayor. As a consequence, a conflict could not arise from dual representation since the city was out of the case. The question therefore became whether a conflict was "likely to arise," since a notice of appeal had been filed from the order dismissing the claims against the city. Analysis of that question requires careful consideration of the grounds of the dismissal and the likelihood that the order would be reversed on appeal, thereby putting the city back in the case. Neither issue is addressed in the record or the judge's decision. Moreover, even if we assume that the order dismissing the city might be reversed,

---

[12] Similar standards of review have been applied in analogous cases of discretionary action. See, e.g., *Capuano, Inc.* v. *School Bldg. Comm. of Wilbraham*, 330 Mass. 494, 496 (1953) (discretionary determinations of public official may not be controverted unless illegal or arbitrary); *Fred C. McClean Heating Supplies, Inc.* v. *Westfield Trade High Sch. Bldg. Comm.*, 345 Mass. 267, 269 (1962) (same as *Capuano*).

there is nothing in the present record to suggest that the city solicitor's mutual defense of the city and the mayor would involve conflicting, divergent or even different theories of defense. The right to reimbursement out of public funds for charges of outside counsel is triggered under the ordinance by an actual or probable conflict of interest — not by the remote *possibility* of an undefined conflict at some future time.

Much of the same reasoning applies to the possibility of a suit by the mayor against the city. At the time of the change of representation, at most some seven months remained in which such a claim might have been initiated under the applicable statute of limitations. See G. L. c. 258, §§ 2 & 4.[13] There is no indication in the record of the nature of any claim which the mayor might reasonably have asserted against the city. Nor is there the slightest hint that he was considering bringing suit, or that the city solicitor had reasonable grounds to anticipate a suit. Had it been the mayor's intention to sue the city, he would first have been required by statute to file a claim with the city in writing, thereby providing notice of his intent to sue well in advance of any filings in court. No written notice of claim was ever furnished and no action was in fact ever commenced by the mayor within the time allowed by law. The record does not support a conclusion that the city solicitor had any reasonable basis for thinking that an action by the mayor against the city was likely.

The possibility that the city solicitor might be called as a witness in the Ossinger action raises different considerations. The disqualification or withdrawal of counsel in cases where counsel may become a witness is a matter usually left to the judgment of the attorney and his client. See *Bor-*

---

[13] We assume that any claim the mayor may have had against the city had arisen at the time of the March, 1980, firing of Ossinger. In order to initiate an action against the city, the mayor would have to present his claim in writing within two years of the time the cause of action arose. If the claim was denied, suit could be brought within three years of the date upon which the cause of action arose. G. L. c. 258, § 4.

*man* v. *Borman*, 378 Mass. 775, 787-790 (1979); S.J.C. Rule 3:22, DR 5-101(b), DR 5-102, 359 Mass; 796, 814-815 (1972). The difficulty in this case, however, lies in the fact that the ordinance does not address payment for outside counsel where representation by the city solicitor is inappropriate because he may be called as a witness. The ordinance provides only that the city solicitor shall defend covered officials and that if a conflict arises out of his "mutual defense" of the city and the officer, the city will pay for private counsel. The single, narrowly limited situation in which the ordinance permits payment of counsel fees does not extend to disqualifications other than those arising from dual representation. While we perceive no limitation in G. L. c. 258, § 9, prohibiting enactment of an ordinance which would provide for the reimbursement of attorney fees when private counsel is necessitated because city legal personnel may be called as witnesses, the ordinance, as it stands, is not such an enactment.

The present record reflects neither consideration of these issues, nor the existence of an evidentiary base sufficient for that purpose. Under the ordinance the existence of a conflict is a condition precedent to city payment of outside counsel. Because resolution of the issue of conflict of interest might terminate this litigation, we conclude that the question of conflict should be remanded to the Superior Court for consideration of the issues discussed, and the taking of further evidence if deemed necessary.

4. The plaintiffs allege that the mayor cannot be indemnified under the ordinance because the Ossinger litigation does not flow (in the words of the ordinance) from an "act or omission [while] acting within the scope of . . . official duties or employment." It is asserted that the mayor may have over-stepped his authority by (1) inducing Ossinger to accept employment by offering civil service benefits which, by statute, were unavailable to her; and (2) initiating the chain of events which led to her dismissal by giving her his personal paychecks to cash. The arguments are unsound. Ossinger's complaint alleged nothing more than a wrongful

termination of employment, accomplished through defective process. We think it beyond serious question that a mayor possesses the authority to fire his secretary.[14] As long as the act complained of (in this case, the firing) is of the type which may in the normal course of events be lawfully performed by the official, then it is "within the scope of his official duties or employment," even though, in a particular case, the action may be improperly motivated or ineptly or even unlawfully executed. The issue in such a case is not the scope of the official's authority, but whether that authority has been abused in its exercise. The circumstances surrounding Ossinger's hiring and leading to her firing are simply not relevant to the issue of the mayor's authority to terminate her as an employee.

5. Since the appropriation of $10,000 to pay Mr. Barshak for legal services was premature and therefore invalid, the open meeting law claim need not be addressed. For the same reasons, we do not reach the plaintiffs' remaining arguments, which involve claims of abuse of discretion in the denial of a welter of motions concerning discovery and a variety of other issues.

The judgment is reversed and the case remanded to the Superior Court for further proceedings on the question of conflict of interest, after which a new judgment is to be entered declaring the rights of the parties consistent with this opinion.

*So ordered.*

---

[14] The judge observed that "[t]he plaintiffs do not dispute that Mayor Mann possesses the authority, by virtue of his position as Mayor, to hire and fire his secretary. Clearly then, this termination was an action within the 'scope of his employment' as a city official." The plaintiffs admit that this statement is "basically true."